# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

PERRY JOHNSON,                                          Case No.

     Plaintiff,                                     Hon.

vs.

MICHIGAN BOARD OF STATE
CANVASSERS; JOCELYN BENSON,
in her official capacity as Secretary
of State; and JONATHAN BRATER,
in his official capacity as Director of
the Michigan Bureau of Elections,

     Defendants.

---

**ESSHAKI LEGAL PLLC**
Eric S. Esshaki (P83393)
Attorney for Plaintiff
38500 Woodward Ave., Suite 330
Bloomfield Hills, MI 48304
(313) 460-1421
eric@esshakilegal.com

---

## PLAINTIFF'S EX-PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

Pursuant to Fed. R. Civ. P. 65(a), Plaintiff Perry Johnson ("Johnson") moves for a temporary restraining order and/or preliminary injunction against Defendants Michigan Board of State Canvassers, Jocelyn Benson, and Jonathan Brater (collectively, "Defendants"), ordering them to refrain from enforcing the signature requirements prescribed in M.C.L. § 168.53 and 168.544(f).

1

In support of his motion, Johnson submits the following Brief in Support and his affidavit (Exhibit A), confirming that Johnson is likely to succeed on the merits with respect to the unconstitutionality of M.C.L. §168.53 and 168.544(f) as applied, considering the unprecedented allegations of fraud related to the circulation of signature petitions and the hasty procedural changes implemented by the Bureau of Elections, which resulted in an unprecedented number of signatures being invalidated.

Absent the issuance of a temporary restraining order, Johnson will incur irreparable injury because his name will not appear on the August 2022 primary election ballot and he and his supporters will be deprived of a meaningful opportunity to vote for him. The balance of equities tips in favor of Johnson because Defendants' enforcement of M.C.L. § 168.53 and 168.544(f) in combination with the new Bureau of Election's Procedures are not narrowly tailored to meet any compelling state interest and imposes a severe burden on Johnson.

Local Rule 7.1(a)(1) requires Plaintiff to ascertain whether this motion will be opposed. Plaintiff's counsel, Eric Esshaki, has sought concurrence in the relief sought in this motion by attempting the following contact on June 6, 2022 between the hours of 1:00 PM and 2:00 PM with Assistant Attorney General Heather Meingast at (517) 335-7659 and left a message with "Lisa," Ms. Meingast's secretary and sent Ms. Meingast an email (meingasth@michigan.gov) seeking

2

concurrence for this Motion; Defendant Board of Canvassers by email (mdos-canvassers@michigan.gov); Defendant Jocelyn Benson by email (bensonj4@michigan.gov); and Jonathon Brater by email (braterj@michigan.gov). Phone numbers could not be obtained through a diligent search for any of the Defendants.

I, Eric Esshaki, certify that this document complies with Local Rule 5.1(a). I also certify that this document is the appropriate length pursuant to Local Rule 7.1(d)(3).

Respectfully submitted,

**ESSHAKI LEGAL PLLC**

Dated: June 6, 2022
By: /s/ *Eric S. Esshaki*
Eric S. Esshaki (P83393)
38500 Woodward Ave., Suite 330
Bloomfield Hills, MI 48304
(313) 460-1421

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

PERRY JOHNSON,                                              Case No.

      Plaintiff,                                      Hon.

vs.

MICHIGAN BOARD OF STATE
CANVASSERS; JOCELYN BENSON,
in her official capacity as Secretary
of State; and JONATHAN BRATER,
in his official capacity as Director of
the Michigan Bureau of Elections,

      Defendants.

---

**ESSHAKI LEGAL PLLC**
Eric S. Esshaki (P83393)
Attorney for Plaintiff
38500 Woodward Ave., Suite 330
Bloomfield Hills, MI 48304
(313) 460-1421
eric@esshakilegal.com

---

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

i

# TABLE OF CONTENTS

Page

STATEMENT OF ISSUES PRESENTED...........................................................iii

INDEX OF AUTHORITIES....................................................................iv

I.  PRELIMINARY STATEMENT .......................................................... 1

II.  STATEMENT OF FACTS.............................................................. 3

III.  LEGAL STANDARD..................................................................... 9

IV.  ARGUMENT................................................................................. 9

    A.  JOHNSON IS LIKELY TO SUCCEED ON THE MERITS REGARDING COUNT I OF THE COMPLAINT BECAUSE IN COMBINATION WITH THE BOE PROCEDURES, M.C.L. 168.53; 168.544(F) ARE UNCONSTITUTIONAL AS APPLIED TO JOHNSON........................................................................ 10

    B.  JOHNSON IS LIKELY TO SUCCEED ON THE MERITS REGARDING COUNT II OF THE COMPLAINT BECAUSE JOHNSON HAS BEEN DEPRIVED OF A FUNDAMENTAL RIGHT WITHOUT DUE PROCESS, INCLUDING A MEANINGFUL OPPORTUNITY TO BE HEARD ........................................ 16

    C.  JOHNSON WILL SUFFER IMMEDIATE AND IRREPARABLE HARM IN THE ABSENCE OF RELIEF .......................................................... 19

    D.  THE BALANCE OF EQUITIES TIPS DECIDEDLY IN JOHNSON'S FAVOR ... 20

    E.  AN INJUNCTION IS IN THE PUBLIC INTEREST ....................................... 20

V.  CONCLUSION ............................................................................21

## <u>STATEMENT OF ISSUES PRESENTED</u>

1.  Whether Plaintiff is likely to succeed on the merits.

    a.  Whether M.C.L. §§ 168.53 and 168.544(f) are unconstitutional as applied to Johnson as a candidate for Governor when considered in combination with the canvassing processes the Bureau of Elections hastily implemented and arbitrarily applied to Johnson's petition signatures and in light of allegations of unprecedented and systematic fraud perpetrated by third-party petition circulators.

    b.  Whether Johnson's due process rights were violated when Defendants deprived him of an opportunity to be heard in a meaningful manner by failing to provide to him the signatures that the Bureau of Elections deemed invalid and by giving him only three days to prepare his challenge, requiring the review of approximately 17,500 signatures when the Bureau of Elections could only complete the review of approximate 7,000 signatures over the course of several weeks.

2.  Whether Johnson is likely to suffer irreparable harm in the absence of this Court's issuance of a temporary restraining order prohibiting Defendants from enforcing M.C.L. §§ 168.53 and 168.544(f) or other alternative relief this Court deems necessary.

3.  Whether the balance of equities tips in favor of Johnson.

4.  Whether a temporary restraining order is in the public interest.

# INDEX OF AUTHORITIES

Cases                                                                                                    Page (s)

*ACLU v. Ashcroft*,
    322 F.3d 240, 251 n. 11 (3rd Cir. 2003) ................................................................21

*Armstrong v. Manzo*,
    380 U.S. 545, 552 (1965) .......................................................................................16

*Bormuth v. Johnson*,
    Civil Action No. 16-13166, 2016 U.S. Dist. LEXIS 181468 (E.D. Mich. Oct. 24,
    2016) ......................................................................................................................15

*Elrod v. Burns*,
    427 U.S. 347, 373-74 (1976) ........................................................................... 16, 19

*Graveline v. Johnson*,
    336 F. Supp. 3d 801 (E.D. Mich. 2018) ...........................................................9, 14

*Illinois State Bd. of Elections v. Socialist Workers Party*,
    440 U.S. 173, 184, 99 S. Ct. 983, 990 (1979) ......................................................20

*Lawrence v. Blackwell*,
    430 F.3d 368, 373 (6th Cir. 2005) ........................................................................10

*Libertarian Party of Ohio v. Blackwell*,
    462 F.3d 579, 593 (6th Cir. 2006) ........................................................................20

*Mathews v. Eldridge*,
    424 U.S. 319, 323 (1976) .......................................................................................16

*Ne. Ohio Coal. for Homless & Serv. Employees Int'l Union, Local 1199 v.
Blackwell*,
    467 F.3d 999, 1009 (6th Cir. 2006) ........................................................................9

*Shelby Cty. Advocates for Valid Elections v. Hargett*,
    348 F. Supp. 3d 764, 769 (W.D. Tenn. 2018) ........................................................9

*Uniroyal Goodrich Tire Co. v. Hudson*,
    856 F. Supp. 348, 356 (E.D. Mich.1994) .............................................................19

*Williams v. Rhodes*,
    393 U.S. 23, 30, 90 S. Ct. 5 (1968) ............................................................. 10, 19

*Wesberry v. Sanders*,
    376 U.S. 1, 17, 84 S. Ct. 526, 535 (1964) ..........................................................10

Statutes

M.C.L. § 168.53 ...............................................................................................4, 10

M.C.L. § 168.544(f) ..........................................................................................4, 10

Rules

Fed. R. Civ. P 65 ....................................................................................................9

## BRIEF IN SUPPORT

Plaintiff Perry Johnson ("Johnson") respectfully submits this brief in support of his motion for temporary restraining order and/or preliminary injunction.

## I.        PRELIMINARY STATEMENT

This case is about an alleged unprecedented fraud perpetrated on the voters of Michigan by a handful of individuals and Defendants' subsequent (i) changing of the rules in the final hour; (ii) depriving Johnson of a meaningful opportunity to be heard; and (iii) ultimately causing the disenfranchisement of millions of Michigan voters. Defendants' games must stop here.

As a matter of first principles, notions of equity and fairness demand that a fraud perpetrated by a few should not and cannot be allowed to have the effect of disenfranchising millions of voters across the state of Michigan. Defendants' refusal, however, to include Johnson on the August primary election ballot does exactly that.

Over the past several months, Johnson has secured the support of hundreds of thousands of Michigan voters for his run for Governor. He has spent countless hours and substantial amounts of money campaigning. All recent relevant polling showed unequivocally that Johnson was one of the front-runners in the Republican primary race.

Johnson and his campaign have been working diligently over the last couple months collecting petition signatures to gain access to the primary election

1

ballot. In total, Johnson, through his volunteer team and unaffiliated third-party vendors, collected and filed with the Secretary of State's office 23,193 signatures on or before April 19, 2022.

On May 23, 2022, the Secretary of State's Bureau of Elections ("BOE") issued its staff reports to candidates. Exhibit B, Perry Johnson Staff Report, p. 1. Johnson's report indicated that, although he had submitted well in excess of the 15,000 required signatures, only 13,800 were facially valid, thus disqualifying him from being placed on the Republican primary election ballot in August 2022. *Id.* Johnson's report indicated that a total of 9,393 signatures were deemed invalid. *Id.* Of those, 6,983 signatures were invalidated because they were collected by petition circulators alleged to have committed fraud on a massive scale. The remaining 2,410 signatures were invalidated with almost no explanation at all and without disclosing to Johnson which 2,410 of the 23,193 signatures the BOE was invalidating.

Notwithstanding his broad support, Defendants', through secretive processes, deceptive practices, and on nothing more than whims of fraud, drastically changed the Board of Election Procedures ("BOE Procedures") for canvassing petition signatures. Exhibit C, Staff Report on Fraudulent Nominating Petitions. Those changes unlawfully permitted the BOE to arbitrarily invalidate 6,983 of Johnson's signatures as fraudulent without even giving so much as a first glance at 5,580 of those. The unlawful invalidation of those 5,580, along with the 2,410

2

undisclosed (and allegedly invalid) signatures left Johnson only 1,200 signatures short of the required 15,000 signature threshold to have his name printed on the ballot.

Defendants attempted to justify the changes to the BOE Procedures based on several novel, inconsistent, trivial, and wholly arbitrary data points. They then used those data points as pretext to categorize petition circulators as fraudulent ("Fraudulent Circulators") and proceeded to invalidate *every* signature those circulators collected by merely spot checking fewer than twenty percent of those signatures. *Id.* at 4-5. That means that, contrary to Michigan Law, 5,580 signatures were invalidated without anyone from the BOE actually comparing the signature to the Qualified Voter File ("QVF").

## II.      STATEMENT OF FACTS

### Perry Johnson's Campaign

Johnson is a Republican candidate for Governor in Michigan who seeks the Republican Party's nomination via the August 2, 2022 primary ballot. Johnson has hired campaign staff and has been diligently campaigning since in or around January 2022.

Pursuant to Michigan election law, to appear on the official primary ballot, Johnson and other party-affiliated candidates are required to file with the Michigan Secretary of State's office, a nominating petition with at least fifteen-thousand

signatures and up to thirty-thousand signatures of qualified and registered electors residing in the state. M.C.L. §§ 168.53; 168.544(f).[1]

Johnson and his campaign team implemented a plan to collect the required number of signatures early on in his campaign. Johnson's campaign collected 23,193 signatures. Many of these signatures were collected by Johnson's supporters and volunteers. To ensure that he would far exceed the minimum threshold of fifteen-thousand signatures, Johnson's campaign team hired several third-party vendors to help with the collection process. On or before April 19, 2022, Johnson filed 23,193 signatures.

The Secretary of State's Bureau of Elections issued its staff reports to the candidates and their counsel on May 23, 2022 at 7:55 p.m. The Staff Report on Perry Johnson's nominating petitions concluded that although he submitted a total of 23,193 signatures, only 13,800 were facially valid. Exhibit B, Perry Johnson Staff Report, pg. 1. Because that's less than the threshold requirement, the Bureau staff recommended that the Board determine that Johnson's petition was insufficient to qualify him as a Republican gubernatorial candidate for the August 2, 2022 primary. *Id.* at 6.

---

[1] A gubernatorial candidate must also have petitions that are "signed by at least 100 registered resident electors in each of at least ½ of the congressional districts of the state." MCL 168.53. It is undisputed that Johnson satisfied this criteria.

The Staff Report identified a total 9,393 signatures on Johnson's petitions as invalid. *Id.* at 1. Specifically, it concluded that:

      a.     68 signatures were invalid because the signer was not registered to vote.

      b.     1,336 signatures were invalid because of "[j]urisdiction errors (no city in county known by name given by signer, dual jurisdiction entry, jurisdiction name, given by signer does not align with address)"

      c.     269 signatures were invalid because of "[d]ate errors (no date given by signer, date of birth entered, or date given by signer is later than circulator's date of signing)"

      d.     81 signatures were invalid because of "[a]ddress errors (no street address or rural route given)"

      e.     239 signatures were invalid because of "[c]irculator errors (circulator did not sign or date petition)"

      f.     15 signatures were invalid because of "[s]ignature errors (no signature or incomplete signature)"

      g.     402 signatures were invalid because of "[m]iscellaneous errors (signatures of dubious authenticity, where the petition signature does not match the signature on file or multiple signatures appear to have been written by the same individual)."

h.      6,983 signatures were invalid because they were "on sheets submitted by fraudulent-petition circulators." *Id*.

Most shocking is the unprecedented, trivial, and wholly arbitrary BOE Procedures used to "identify" invalid signatures, eighty to ninety percent of which the BOE had not even looked at before invalidating.

Those new BOE Procedures drastically altered the BOE's standard canvassing approach. The standard approach consisted of two stages. First, BOE staff performed a "face review" of the petitions, which checked for correct headers, the presence of the circulator's signature, and correct dates, among other things. Second, BOE staff reviewed any challenges to the petitions' sufficiency, individually checking every challenged signature and comparing to the signature on file in the QVF.

Starting at the end of March, however, the BOE unilaterally changed that approach because "staff noticed a large number of petition sheets, submitted by certain circulators, appeared fraudulent and consisted entirely of invalid signatures." According to the Omnibus Report, under the new approach, the BOE applied several arbitrary and often contradictory criteria during the face review of the petitions, including: (1) an "unusually high number of petition sheets where every signature line was completed, or where every line was completed but one or two lines were crossed out"; (2) sheets with "signs of apparent attempts at intentional signature invalidity"; (3) an "unusually large number of petition sheets that showed no

6

evidence of normal wear that accompanies circulation"; (4) sheets that "appeared to be 'round-tabled'"; (5) sheets on which "blank and completed lines were randomly interspersed" which apparently indicates "that a sheet had been submitted 'mid-round-table'"; (6) sheets "where all ten lines had signatures and partial addresses or dates, but only random subset were fully complete"; (7) sheets on which every instance of the handwriting of certain letters was nearly identical across lines, including signatures"; and (8) sheets "where the two or three distinct handwriting styles appeared on multiple sheets." Exhibit C, at 2.

To the extent that a petition contained any of these characteristics, BOE staff separated that petition and all other petitions submitted by the same circulator.  Then, approximately ten to twenty percent of the signatures on the separated petitions were spot-checked against the signatures on file in the QVF. If BOE staff claimed they could not validate any of the signatures during the spot check, then they categorically invalidated every signature collected by that circulator ("Disqualified Circulator(s)").

On May 23, 2022, around 8:00 p.m., Defendants emailed a Staff Report to Johnson indicating that the BOE was recommending the invalidation of 9,393 of his petition signatures and notifying him that a hearing in front of the Board of Canvassers would take place in only three short days on May 26, 2022. Johnson was represented by his legal team during that hearing, however, because the BOE refused

to identify which of Johnson's 23,193 signatures they decided to invalidate, it was impossible for Johnson to appropriately prepare his case and he was robbed of the opportunity to be heard in a meaningful manner at that hearing.

The following day, on May 27, 2022, the Board of Canvassers voted on whether to accept the BOE's recommendations that Johnson's petition signatures were insufficient. The Board of Canvassers deadlocked along partisan lines. Relying on the board's decision (or lack thereof), Secretary of State Benson has or will cause Johnson's name to not be placed on the primary ballot.

The enforcement of the Ballot Access Statutes in combination with the BOE Procedures effectively prevents Johnson, through no fault of his own and in light of an alleged unprecedented fraudulent scheme, from getting his name on the ballot and running for office in a meaningful way. The enforcement of the Ballot Access Statutes under the circumstances severely injures Johnson and his supporters, and continues to impose severe burdens on him because if the Ballet Access Statutes are enforced, Johnson will not be able to run for office. There is no compelling state interest that justifies the continued and strict enforcement of the Ballot Access Statutes in light of the circumstances. And even if there were, Defendants' reliance on the BOE Procedures to achieve that interest is anything but "narrowly tailored" since those Procedures are overly inclusive and arbitrary.

8

### III.     LEGAL STANDARD

Rule 65 of the Federal Rules of Civil Procedure govern motions for temporary restraining orders ("TRO") and preliminary injunctions. The court considers several factors to determine whether to issue a TRO. Those factors are "(1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent a stay, (3) whether granting the stay would cause substantial harm to others, and (4) whether the public interest would be served by granting the stay." *Ne. Ohio Coal. for Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). The factors "are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *Shelby Cty. Advocates for Valid Elections v. Hargett*, 348 F. Supp. 3d 764, 769 (W.D. Tenn. 2018) (internal citations omitted). Importantly, "in First Amendment cases, the crucial inquiry is usually whether the plaintiff has demonstrated a likelihood of success on the merits [since] the issues of the public interest and harm to the respective parties largely depend on the constitutionality of the state action." *Graveline v. Johnson*, 336 F. Supp. 3d 801, 807 (E.D. Mich. 2018) (internal citations and quotes omitted).

### IV.     ARGUMENT

Johnson brings his motion for a temporary restraining order and/or a preliminary injunction pursuant to Federal Rule of Civil Procedure 65, which

9

provides that "the court may issue a temporary restraining order without written or oral notice to the adverse party."

A.  **JOHNSON IS LIKELY TO SUCCEED ON THE MERITS REGARDING COUNT I OF THE COMPLAINT BECAUSE IN COMBINATION WITH THE BOE PROCEDURES, M.C.L. 168.53; 168.544(F) ARE UNCONSTITUTIONAL AS APPLIED TO JOHNSON.**

Ballot access laws "place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms." *Williams v. Rhodes*, 393 U.S. 23, 30, 89 S. Ct. 5, 10 (1968). Indeed, "other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S. Ct. 526, 535 (1964). Thus, "when a state promulgates a regulation which imposes a 'severe' burden on individuals' rights, that regulation will only be upheld if it is 'narrowly drawn to advance a state interest of compelling importance." *Lawrence v. Blackwell*, 430 F.3d 368, 373 (6th Cir. 2005).

Pursuant to Michigan election law, to appear on the official primary ballot, Johnson was required to file with the Michigan Secretary of State's office a nominating petition with at least fifteen-thousand signatures and up to thirty-thousand signatures of qualified and registered electors. M.C.L. §§ 168.53; 168.544(f) (the "Ballot Access Statutes").

10

Importantly, under normal circumstances, the Ballot Access Statutes impose a reasonable burden on candidates. Candidates typically anticipate that irregularities may be discovered in their petition signatures, and they account for those irregularities by filing more signatures than are required. Believing he was operating under normal circumstances, that is exactly what Johnson did; he filed 8,193 more signatures than required. Neither Johnson, nor anyone else (except for, perhaps Defendant Brater) could have reasonably anticipated the degree of fraud that allegedly occurred here.

That alleged fraud, however, caused the BOE to hastily invent unvetted criteria and procedures to invalidate fraudulent signatures. Thus, there is nothing normal about these circumstances.

The BOE's Procedures deviated substantially from traditionally used procedures and empowered the BOE to categorically (and arbitrarily) invalidate an unprecedented number of signatures in one swoop and without providing candidates with an opportunity to challenge its actions. To make matters worse, candidates were not made aware of the new BOE Procedures until well after the filing deadline, leaving them without any means to supplement their signatures. Using those procedures, the BOE ultimately invalidated a shocking 68,000 petition signatures (6,983 of which were submitted by Johnson).

11

The BOE Procedures changed the rules after the game and did not tell anyone. Those Procedures now empower the BOE with the authority to invalidate signatures on a whim without having ever reviewed the signatures they are invalidating. The ease with which the new Procedures permit the invalidation of signatures leaves candidates like Johnson without a standard by which to assess whether those signatures are valid.

There are several reasons for this. First, those Procedures were implemented without notice and after the filing deadline, so Johnson had no means to provide additional signatures to compensate for the newly created uncertainty. Had Johnson been made aware that the new Procedures permitted the categorical invalidation of *all signatures gathered* by any one person who the BOE deemed a Fraudulent Circulator, he would have limited the total number of petitions each Circulator could submit to his campaign. Additionally, he would have reviewed the signatures on an ongoing basis based on the new indicia of fraud the BOE used. Further, he would have submitted the allowable maximum of thirty-thousand signatures as a further "cushion."

Second, the new Procedures are inherently arbitrary and contradictory. According to the BOE an indicium of fraud is a petition where every signature line was completed, and also a petition that included both blank and completed lines. Another indicium of fraud was said to be intentional signature invalidity, which

seems to suggest that the BOE requires invalid signatures to validate the validity of valid signatures. As further explanation, the BOE opined that some circulators cross out invalid signatures to "mimic legitimate circulators crossing out names," yet not a shred of evidence was provided to support this wild speculation. Moreover, the BOE has apparently determined that the amount of "wear" on the petition is an indicium of fraud, without any basis in fact whatsoever. Exhibit C, at 2.

Third, the BOE claims that it can invalidate one hundred percent of signatures collected by Fraudulent Circulators since twenty percent were spot-checked and deemed fraudulent. The problem here is that the BOE has not and will not disclose which signatures it included in its twenty percent. It is entirely possible that the BOE only reviewed signatures submitted by two of the eighteen Fraudulent Circulators to reach that twenty percent threshold. That means that there could have been approximately 5,500 signatures submitted by sixteen "Fraudulent Circulators" that were never reviewed by anyone. Additionally, Johnson received signatures from the Fraudulent Circulators in two separate batches, one in mid-March and one in mid-April. It is entirely possible that any alleged fraud occurred exclusively in the later month and closer to the filing deadline when circulators are down to the wire. Thus, if the BOE's twenty percent sampling came exclusively from the April batch, it could have missed perfect valid signatures from the earlier March batch. Indeed, Johnson filed several petitions that were circulated in early March by so called

13

"Fraudulent Circulators" without any indicia of fraud to speak of. *See* Exhibit D, examples of Johnson petitions from early March.

The Ballot Access Statutes, which require a minimum of 15,000 signatures and the BOE Procedures, which exponentially decrease the threshold to invalidate signatures, when combined, impose a severe burden on Johnson's rights by rendering it nearly impossible and severely burdensome to satisfy the statutory signature requirement.

In combination with the BOE's drastic, sudden, and unexpected changes in the canvassing process, the enforcement of the Ballot Access Statutes is unconstitutional. The new BOE Procedures significantly changed the rules and made validity determinations arbitrary and unpredictable for candidates. Moreover, those Procedures were implemented without notice to candidates, leaving them without the ability to plan for the uncertainty that they created. Unfortunately, that uncertainty came to fruition when Defendants arbitrarily and unjustly invalidated more than forty percent of Johnson's signatures.

Taken together, the Ballot Access Statutes and the BOE Procedures impose burdens so severe that they "function as an absolute bar" to Johnson getting his name on the August 2022 primary ballot. *Graveline*, 336 F.Supp.3d at 809. There are no alternative means for Johnson to appear on the ballot, and voters have no alternative

means to exercise their vote effectively if Johnson is not permitted to have his name on the ballot.

Because the combined application of the Ballot Access Statutes and the BOE Procedures severely burden Johnson's rights, Defendants "must set forth precise interests of compelling importance and show that the regulations are necessary and narrowly tailored to advance those interests." *Id.* at 813. This, Defendants cannot do. There is no compelling or legitimate state interest for Defendants' insistence on enforcing the Ballot Access Statutes when a wholly legitimate gubernatorial candidate has fallen victim to the fraud of a third party. *Bormuth v. Johnson*, Civil Action No. 16-13166, 2016 U.S. Dist. LEXIS 181468, at *19 (E.D. Mich. Oct. 24, 2016) ("Public policy requires that statutes controlling the manner in which elections are conducted be construed as far as possible in a way which prevents the disenfranchisement of voters through the fraud or mistake of others." (internal citations omitted)).

Even if there were a compelling state interest, nothing about the BOE Procedures are narrowly tailored to achieve that interest. In fact, those Procedures are broad, arbitrary, and provide the BOE with the extraordinary remedy of invalidating tens of thousands of signatures in one swoop without any review whatsoever. Defendants have at their disposal a multitude of potential alternatives

to achieve the state's interest, including lowering the signature requirements to account for the last-minute changes in Procedure.

**B. JOHNSON IS LIKELY TO SUCCEED ON THE MERITS REGARDING COUNT II OF THE COMPLAINT BECAUSE JOHNSON HAS BEEN DEPRIVED OF A FUNDAMENTAL RIGHT WITHOUT DUE PROCESS, INCLUDING A MEANINGFUL OPPORTUNITY TO BE HEARD.**

The "fundamental requirement of due process is the opportunity to be heard at a meaningful time and in meaningful manner. *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). Due process is "flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 323 (1976). When determining the "specific dictates of due process," courts consider three factors: "First, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used. . .; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." *Id.* (internal citations omitted).

Johnson has a fundamental right to seek public office and he cannot be deprived of that right without due process. *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976). Defendants' unlawfully denied Johnson access to the ballot without providing him with an opportunity to be heard in a meaningful manner. Defendants refused to disclose which of his 23,193 signatures they deemed invalid. Defendants' failure to disclose that information to Johnson effectively deprived him of any

16

meaningful opportunity to be heard because he was provided with no meaningful information with which to prepare his case.

On May 23, 2022, at around 8 p.m., Defendants emailed a Staff Report to Johnson indicating that the BOE had invalidated 9,393 of his petition signatures. Defendants disqualified 6,983 signatures on Mr. Johnson's petitions for being circulated by alleged forgers. But Defendants failed to specifically identify or explain their basis for concluding that any specific signatures on his petitions were not genuine.

Defendants further violated Johnson's due process rights by disqualifying 2,410 of Johnson's signatures for a grab-bag of reasons. The BOE would not provide Johnson with an itemized list of those disqualified signatures, or a specific explanation why most of them were deemed invalid. Instead, the Bureau only specifically identified 78 signatures that it contends were invalid. Even if it's assumed that those 78 signatures were invalid (it's not clear that they are), the Bureau's failure to disclose to Johnson the 2,332 remaining signatures made it impossible for him to prepare his case to rehabilitate those signatures.

Thus, without knowing which signatures the BOE was invalidating, Johnson was forced to comb through nearly all 23,193 signatures and then guess as to which of those comprised the 2,332 signatures the BOE invalidated. The absurdity of such a requirement cannot be understated. The BOE's refusal to inform Johnson as to

17

which signatures it invalidated is akin to a prosecutor charging someone with murder and making him guess as to whose murder he is charged with.

The only way in which Johnson could reasonably ensure that his arguments regarding the 2,332 invalidated signatures were heard in a meaningful manner (or at all), was to make arguments that all 23,193 signatures should be deemed valid. That is an insurmountable task with even an unlimited amount of time to prepare. Here, however, Johnson had three days to prepare.

The difficulties Defendants imposed on Johnson are underscored by the BOE's own admission that it only had time to review approximately 7,000 signatures over the course of several weeks. Yet somehow Johnson was expected to review over twenty-three thousand signatures in three days.

Thus, in addition to withholding from Johnson the information necessary for him to prepare his case, the time constraints imposed upon him were wholly unreasonable given the magnitude of the task. Both the withholding of vital information and time constraints effectively robbed Johnson of any opportunity to be heard in a meaningful manner. That is not due process.

Defendants had a clear legal duty to follow the United States Constitution and to respect Johnson's due process rights. Defendants' refusal to include Johnson on the primary ballot is a violation of his fundamental rights. Those rights have been violated without Johnson having been provided an opportunity to be heard in a

18

meaningful manner in clear violation of his due process rights. Thus, Defendants should be enjoined from preventing the placement of Johnson's name on the ballot until or unless Johnson has had a meaningful opportunity to be heard.

C.   JOHNSON WILL SUFFER IMMEDIATE AND IRREPARABLE HARM IN THE ABSENCE OF RELIEF.

An injury is irreparable if it is not fully compensable in monetary terms. *See, e.g., Uniroyal Goodrich Tire Co. v. Hudson*, 856 F. Supp. 348, 356 (E.D. Mich. 1994). It is well-settled that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976). "Restrictions on access to the ballot impinge on the fundamental right to associate for the advancement of political beliefs and the fundamental right to vote." *Id.*

By preventing Johnson access to the ballot, the BOE Procedures in combination with the Ballot Access Statutes "place burdens on two different, although overlapping, kinds of rights – the right of individuals to associate for the advancement of political beliefs and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30, 90 S.Ct. 5 (1968). Absent relief from this Court, Johnson's name will not be placed on the ballot. This will deprive Johnson and his supporters of an effective choice and is burdensome, unreasonable, and is not narrowly tailored to meet any compelling or legitimate state interest.

19

**D.    THE BALANCE OF EQUITIES TIPS DECIDEDLY IN JOHNSON'S FAVOR.**

"There are few greater burdens that can be placed on a political [candidate] than being denied access to the ballot." *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 593 (6th Cir. 2006) (internal citations omitted).

Defendants' enforcement of the Ballot Access Statutes in combination with the BOE Procedures they implemented *after* the final hour and without time for Johnson to respond, effectively robs Johnson of the opportunity to gain access to the ballot. Given the magnitude of this burden, Defendants are left searching in vain to surmise a state interest of compelling enough importance to continue to enforce the Ballot Access Statutes in comparison to the burdens they have imposed on Johnson by adopting procedures that unlawfully allow for the invalidation of over five-thousand signatures without even a first glance.

**E.    AN INJUNCTION IS IN THE PUBLIC INTEREST.**

Enforcement of the Ballot Access Statutes under the circumstances severely limits the choices available to voters. The Supreme Court has noted that "by limiting the choices available to voters, the State impairs the voters' ability to express their political preferences." *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184, 99 S. Ct. 983, 990 (1979). Ensuring that Johnson's name is on the ballot expands the choices available to voters and is thus in the public interest.

20

When such rights are at stake, a State must establish that the enforcement of its Ballot Access laws are necessary to serve a compelling interest. *See id.* Here, Defendants are enforcing an unconstitutional law, which cannot serve as the basis for a compelling interest of the state. *See, e.g., ACLU v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003) ("Neither the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law")).

Moreover, it is in the public's interest to ensure that the fraudulent actions of a few do not cause the disenfranchisement of millions of Michigan voters who support and want to vote for Johnson as their Governor.

## V.      CONCLUSION

**WHEREFORE,** Johnson respectfully requests that this Court (i) enter a temporary restraining order and/or a preliminary injunction against Defendants restraining them from enforcing the Ballot Access Statutes and/or requiring them to modify those Statutes to ensure that his rights are protected, (ii) enter an order declaring null and void the BOE Procedures, including any official actions taken in reliance on the results of those Procedures, (iii) enter an order enjoining Defendants from preventing the placement of Johnson's name on the ballot until or unless Johnson has had a meaningful opportunity to be heard; (iv) enter an order requiring the Secretary of State to immediately cease the printing of August 2022 primary

ballots until this motion is decided; and (v) such other equitable relief as this Court deems appropriate.

Respectfully submitted,

**ESSHAKI LEGAL PLLC**
By: /s/ *Eric S. Esshaki*
      Eric S. Esshaki (P83393)
      38500 Woodward Ave., Suite 330
      Bloomfield Hills, MI 48304
      (313) 460-1421
      eric@esshakilegal.com
      *Attorney for Plaintiff*

Dated: June 6, 2022

## CERTIFICATE OF SERVICE

**THE UNDERSIGNED** certifies that on the 6th day of June, 2022, the foregoing paper was electronically filed with the Clerk of the Court using the ECF system.

/s/ *Eric Esshaki*
Eric Esshaki
Attorney