# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

PERRY JOHNSON,

      Plaintiff,

v.

MICHIGAN BOARD OF STATE
CANVASSERS; JOCELYN BENSON
in her official capacity as Secretary of
State; and JONATHAN BRATER, in
his official capacity as Director of the
Michigan Bureau of Elections,

      Defendants.

Case No. 2:22-cv-11232-MAG-JJCG

Hon. Mark A. Goldsmith

Magistrate Judge Jonathan J.C. Grey

---

## RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

DYKEMA GOSSETT PLLC • Capitol View, 201 Townsend Street, Suite 900, Lansing, Michigan 48933

Page

INTRODUCTION ................................................................................................1

STATEMENT OF FACTS ...................................................................................2

I.    Johnson Announces His Candidacy for Office and Submits Nominating Petitions. ..........................................................................2

II.   Bray and Others Identify Fraud in the Nominating Petitions, and the Bureau of Elections Investigates. ...........................................3

III.  The Bureau of Elections Investigates the Fraud and Finds Johnson Submitted an Insufficient Amount of Non-Fraudulent Signatures. ...............................................................................................4

IV.   Johnson Sues In State Court, and the Michigan Court of Appeals and Supreme Court Reject His Arguments. ...............................8

V.    Johnson Seeks Another Bite at the Apple, and Sues in Federal Court. .....................................................................................................11

LEGAL STANDARDS .......................................................................................12

ARGUMENT ......................................................................................................12

I.    This Court Should Decline to Alter Michigan's Election Law at the 13th Hour. ....................................................................................12

II.   Johnson Is Not Likely to Succeed on the Merits of His Claims. .............15

    A.    Johnson's First Amendment Claim Lacks Merit. ..........................15

        1.    Johnson Failed to Raise this Argument in State Court. .......15

        2.    Michigan's Signature Requirement Laws Meet the *Anderson-Burdick* Test ...........................................................16

    B.    Johnson's Due Process Argument Lacks Merit. .............................22

III.  Any Harm to Johnson is the Result of His Own Negligence, and the Issuance of an Injunction Will Cause Substantial Harm to

**Others**..................................................................................................**24**

**IV.**   **An Injunction Is Not in the Public Interest**..............................................**25**

**CONCLUSION**..........................................................................................**25**

DYKEMA GOSSETT PLLC • Capitol View, 201 Townsend Street, Suite 900, Lansing, Michigan 48933

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Celebrezze*,
460 U.S. 780, 787 (1983) ................................................................................. *passim*

*Ariz. Green Party v. Reagan*,
838 F.3d 983 (9th Cir. 2016) ...................................................................19

*Ariz. Libertarian Party v. Hobbs*,
925 F.3d 1085 (9th Cir. 2019) .................................................................19

*Barrow v. City of Detroit Election Comm'n*,
836 NW.2d 498 (Mich. Ct. App. 2013) ........................................... 20, 23

*Benisek v. Lamone*,
138 S. Ct. 1942 (2018) .............................................................................14

*Burdick v. Takushi*,
504 U.S. 428, 433 (1992) ...................................................... 1, 16, 17, 21

*Democratic Party of Haw. v. Nago*,
833 F.3d 1119 (9th Cir. 2016) .................................................................17

*Eason v Whitmer*,
485 F Supp 3d 876 (ED Mich, 2020) .....................................................22

*Enchant Christmas Light Maze & Mkt. v. Glowco, LLC*,
958 F.3d 532 (6th Cir. 2020) ...................................................................12

*Esshaki v. Whitmer*
813 F. App'x 170 (6th Cir. 2020) .................................................... 17, 22

*Graveline v. Benson*,
430 F. Supp. 3d 297 (E.D. Mich. 2021) ..................................................20

DYKEMA GOSSETT PLLC • Capitol View, 201 Townsend Street, Suite 900, Lansing, Michigan 48933

iv

*Hawkins v. DeWine*,
968 F.3d 603 (6th Cir. 2020) ........................................................................ 21, 22

*Jenness v. Fortson*,
403 U.S. 431 (1971)........................................................................................ 18, 19

*Johnson v Bd of State Canvassers*,
--- N.W.2d ---, No. 164461, 2022 Mich. LEXIS 1112 (June 3, 2022)....................10

*Johnson v Board of State Canvassers*,
__ N.W.2d __ , No. 361564, 2022 Mich. App. LEXIS 3139 (June 1, 2022).. *passim*

*Johnson v. Bd. of State Canvassers*,
--- Mich. ---, 2022 Mich. LEXIS 1112 (Mich. June 3, 2022).......................... 11, 13

*Kishore v. Whitmer*,
972 F.3d 745 (6th Cir. 2020) ....................................................................................22

*Kowall v Benson*,
18 F4th 542 (6th Cir. 2021) ............................................................................ vii, 22

*Little v. Reclaim Idaho*,
140 S. Ct. ---, 2020 WL 4360897 (2020)....................................................................14

*Morgan v. White*,
964 F.3d 649 (7th Cir. 2020) ....................................................................................14

*Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*,
305 F.3d 566 (6th Cir. 2002) ....................................................................................12

*Purcell v. Gonzalez*,
549 U.S. 1 (2006)............................................................................... vii, 13, 25

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
140 S. Ct. 1205 (2020)..............................................................................................13

*Schmitt v. LaRose*,
933 F.3d 628 (6th Cir. 2019) ....................................................................................21

DYKEMA GOSSETT PLLC • Capitol View, 201 Townsend Street, Suite 900, Lansing, Michigan 48933

*Scott v. Reif*,
659 F. App'x 338 (6th Cir. 2016) ...........................................................15

*Thompson v. DeWine*,
959 F.3d 804 (6th Cir. 2020) .................................................... 14, 17, 22

*Williams v. Rhodes*,
393 U.S. 23 (1968)..................................................................................16

**Statutes**

Mich. Comp. Laws § 168.53.......................................................... 2, 8, 18, 19

Mich. Comp. Laws § 168.532.................................................................20

Mich. Comp. Laws § 168.552(8)...........................................................3, 4

Mich. Comp. Laws § 168.553.................................................................23

Mich. Comp. Laws § 168.544c...............................................................18

Mich. Comp. Laws § 168.544c(1)............................................................2

Mich. Comp. Laws § 168.544f.............................................................2, 20

Mich. Comp. Laws § 168.686a...............................................................20

Mich. Comp. Laws § 168.737a...............................................................20

Mich. Comp. Laws § 168.759a(5) ..........................................................13

**Constitutional Provisions**

MICH. CONST., art IV, § 1(b) ..................................................................13

MICH. CONST., art IV, § 1(g) ..................................................................14

DYKEMA GOSSETT PLLC • Capitol View, 201 Townsend Street, Suite 900, Lansing, Michigan 48933

vi

## <u>CONCISE STATEMENT OF ISSUES PRESENTED AND MOST CONTROLLING AUTHORITY</u>

1)      Should this Court upend Michigan's administration of its election law to allow Johnson to appear on the ballot despite the Michigan Court of Appeals' finding that he violated the Michigan Election Law and is not entitled to do so?

> **Bray Answers:** No.  *Johnson v Board of State Canvassers*, __ N.W.2d __, No. 361564, 2022 Mich. App. LEXIS 3139 (June 1, 2022); *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (per curiam)

2)      Do Michigan's ballot-access laws, which six candidates were able to comply with, function "as an absolute bar" to the ballot as Johnson contends, rendering them unconstitutional?

> **Bray Answers:** No.  *Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983); *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)

3)      Does Johnson have a fundamental right to appear on the ballot, as he contends, and was that right violated?

> **Bray Answers:** No. *Kowall v. Benson*, 18 F.4th 542, 549 (6th Cir. 2021) ("Just as candidates have no fundamental right to run for office, voters have no fundamental right to 'vote for a specific candidate or even a particular class of candidates.'"); *Johnson v Board of State Canvassers*, __ N.W.2d __ , No. 361564, 2022 Mich. App. LEXIS 3139, at *21 n.8 (June 1, 2022) (explaining that Johnson "was provided with the names of each of the fraudulent-petition circulators, was told how many signatures they had collected that were invalidated, and was made aware that each and every signature submitted by those individuals have, in fact, been invalidated" and that it was "clear that he was provided with notice as to what signatures were being invalidated and the basis for which they were being invalidated. He was also provided with a meaningful opportunity to challenge the finding of invalidity at the May 26, 2022 hearing before the Board").

DYKEMA GOSSETT PLLC • Capitol View, 201 Townsend Street, Suite 900, Lansing, Michigan 48933

## **INTRODUCTION**

After an unsuccessful lawsuit in Michigan's state courts, Plaintiff Perry Johnson asks this Court to ignore his noncompliance with Michigan's ballot-access requirements and place his name on Michigan's primary ballot as a gubernatorial candidate for the nomination of the Republican Party. He contends that Michigan's ballot-access requirements as applied to him are unconstitutionally burdensome under the First and Fourteenth Amendments to the United States Constitution, notwithstanding the fraud committed by his petition circulators, and the ability of six other candidates to qualify for the primary ballot under the exact same ballot access-requirements.

In doing so, Johnson comes to this Court with too little, too late. His arguments are too little because: (1) he failed to raise some of them before Michigan's state courts in a lawsuit filed just a week ago, resulting in a *res judicata* bar; (2) he fails to satisfy the elements of the *Anderson-Burdick* test, as is required to show that Michigan's ballot-access laws are unconstitutional; and (3) his due process claim conflicts with well-settled law establishing that candidates have no due process rights to appear on a ballot. His arguments are too late because the statutory deadline for certifying candidates for the August 2, 2022 primary ballot was June 3, 2022 and the *Purcell* Principle prohibits upending state election law requirements at this late date. Last week, Johnson represented to Michigan's state

1

courts that relief was needed no later than June 3rd.  A week later, he now asks this Court for extraordinary relief well after that same deadline.

## STATEMENT OF FACTS

I.    **Johnson Announces His Candidacy for Office and Submits Nominating Petitions.**

More than four months ago, Johnson announced his candidacy for the nomination of the Republican Party for the office of governor of Michigan.  As a gubernatorial candidate, Johnson was required to submit the valid signatures of 15,000 "qualified and registered electors," with at least 100 signatures from registered resident electors in each of at least half of the congressional districts in Michigan.  Mich. Comp. Laws §§ 168.53 and 168.544f.

On April 19, 2022, just two hours and 17 minutes before the deadline to do so, Johnson filed nominating petitions (the "Johnson Petitions") with the Secretary of State.  Each petition was required to include a warning printed in 12-point, boldface type that "[a] person who knowingly. . . signs a name other than his or her own is violating the provisions of the Michigan Election Law."  Mich. Comp. Laws § 168.544c(1).  Each petition was also required to include a certificate of circulator attesting, among other things, that "each signature on the petition was signed in his or her presence" and that "to his or her best knowledge and belief, each signature is the genuine signature of the person purporting to sign the petition."  *Id.*  In addition, the petitions were required to include a second warning in 12-point, boldface type

2

indicating that "a circulator knowingly making a false statement in the above certificate, a person not a circulator who signs as a circulator, or a person who signs a name other than his or her own as circulator is guilty of a misdemeanor." *Id.*

## II.     **Bray and Others Identify Fraud in the Nominating Petitions, and the Bureau of Elections Investigates.**

Under Michigan law, individuals may file "a sworn complaint, in writing, questioning the registration of or the genuineness of the signature of the circulator or of a person signing a nominating petition filed with the secretary of state."  Mich. Comp. Laws § 168.552(8).  On April 29, 2022, proposed Intervenor Carol Bray filed a sworn complaint (the "Bray Complaint", **Ex. 1**) with the Board of State Canvassers (the "Board") challenging numerous signatures on the Johnson Petitions—including every signature on 343 petition sheets circulated on Johnson's behalf by six circulators:  Stephen Tinnin, Yazmine Vassar, Deshawn Evans, Nicholas Carlton, Diallo Vaughn, and William Williams of Detroit.  (Ex. 1 at 45.)

The Bray Complaint also included a sworn declaration by Betsey Hage of Royal Oak, Michigan.  Hage attested that she had reviewed the Johnson Petition numbered "002114," and that the signature and handwriting appearing on line 6 of that petition sheet purporting to be her name and signature was not hers.  (Bray Complaint, Ex. 1 at B-1.)  She further attested that she did not sign a nominating petition for Johnson or any other Republican candidate for governor.  (*Id.*)  That fraudulent petition sheet was circulated on Johnson's behalf by Brianna Heron.  Bray

3

provided the Board with additional information regarding fraudulent petition signatures included on Johnson Petitions in a filing dated May 11, 2022 (the "Bray Supplement," **Ex. 2**).

III.   **The Bureau of Elections Investigates the Fraud and Finds Johnson Submitted an Insufficient Amount of Non-Fraudulent Signatures.**

Upon receiving Bray's complaint and other complaints relating to nominating petitions, the Bureau of Elections (the "Bureau") proceeded on behalf of the Board and commenced an investigation under Mich. Comp. Laws § 168.552(8).   The Bureau outlined its results in a report dated May 23, 2022.  (Fraud Report, ECF No. 2-4.)   The Fraud Report explained that, generally, the Bureau conducts a "face review" of each petition sheet and signature to ensure that "the signature header and the circulator certificate are properly completed; that each signature is accompanied by an address, name, and date; that the city or township in which the signer claimed to reside was in the county written on the signature; and other issues required for a facially valid sheet or signature."  (*Id.* at 3-4, PageID.66-67.)   If the Bureau determines there is a sufficient amount of facially valid signatures for a candidate, it "reviews any challenges to the petition's sufficiency" and determines whether there are still a sufficient amount of valid signatures.  (*Id.* at 4, PageID.67.)

The rampant fraud in the petition sheets submitted by Johnson and others, however, was unprecedented.  While "it is typical for staff to encounter some signatures of dubious authenticity scattered within nominating petitions," the Bureau

4

was "unaware of another election cycle in which this many circulators submitted such a substantial volume of fraudulent petition sheets consisting of invalid signatures . . ." (*Id.* at 1, PageID.64.)  In all, the Bureau's staff "identified 36 petition circulators who submitted fraudulent petition sheets consisting entirely of invalid signatures." (*Id.*)  Of the 36 Fraudulent-Petition Circulators identified in the Fraud Report, seven had been named earlier in the Bray Complaint.

Given the lack of any similar past instances of widespread fraud, the Bureau exercised its discretion to tailor its investigation to meet the needs of this case. Before conducting the facial review of signatures and petition sheets, "staff reviewed each candidate's petitions for petitions signed by circulators who were suspected of submitting fraudulent sheets." (Fraud Report at 4, PageID.67.)  It separated these petition sheets from the rest and, "[t]o verify that these fraudulent petition sheets did not include sheets or individual signatures that were actually valid signatures submitted by registered voters," the Bureau's "staff conducted a targeted signature check of signatures across each circulator's sheets for each candidate to confirm that these circulators' submissions in fact consisted of fraudulent sheets with invalid signatures." (*Id.* at 4-5, PageID.67-68.)

**In conducting these signature checks, the Bureau did not locate a single non-fraudulent petition sheet or signature submitted by the circulators at issue.** (*Id.* at 5, PageID.68.)  Instead, it noted numerous indicia of fraud on each sheet it

5

reviewed.  This ranged from the inclusion of "voters who were not registered in the appropriate jurisdiction" to "names of valid registered voters with forged signatures."  (*Id.*)

The Bureau's staff was able to identify this fraud by determining "that the signatures, names, addresses and dates on many of the fraudulent sheets were obviously signed by one or a small number of individuals which can be seen" through "similarities in handwriting."  (*Id.*)  In addition, the Bureau's staff explained "that a significant percentage of alleged signatories were no longer registered in the jurisdiction because they had moved from the address marked on the petition sheet months or years before" and that "a number of the alleged signatories' registrations were cancelled because the individual had died prior to the date of signing."  (*Id.*) "**None of the reviewed signatures appearing on these petition sheets had redeeming qualities demonstrating a match when compared with the signature on file**."  (*Id.* at 5 (emphasis added); *see also id. at 1*.  ("All petition sheets submitted by these circulators displayed suspicious patterns indicative of fraud, and staff reviewing these signatures against the Qualified Voter File (QVF) did not identify *any* signatures that appeared to be submitted by a registered voter.").)

Based on this astounding finding—that, of the signatures reviewed by the Bureau, there was not a single valid signature submitted by these circulators—after conducting its "targeted signature check" of the petitions submitted by the

6

circulators at issue, the Bureau "subtracted" the signatures from these petition sheets from the candidate's total and, if after doing so, the candidate lacked enough potentially valid signatures, "recommended the Board determine the petitions sufficient." (Fraud Report at 4-5, PageID.67-68.)

That same day, the Bureau issued a report on the nominating petitions submitted by Johnson (the "Johnson Deficiency Report," ECF No. 2-3.)  The Johnson Deficiency Report determined than Johnson had submitted 13,800 facially valid signatures and 9,393 invalid signatures. (*Id.* at 1, PageID.57.) Of those invalid signatures, 68 signatures were submitted by unregistered voters; 1,336 signatures involved jurisdictional errors; 269 signatures involved date errors; 81 signatures involved address errors; 239 signatures were submitted on petitions that were not signed or dated by the circulator; 15 signatures were incomplete or missing; 402 signatures involved miscellaneous errors; and 6,983 signatures were submitted on sheets by the fraudulent petition circulators. (*Id.*)  Seven of the individuals identified in the Johnson Deficiency Report as "fraudulent-petition circulators" of petitions submitted by Johnson had previously been identified as engaging in forgery or other fraudulent activity in the Bray Complaint. (*Id.* at 2, PageID.58.)

The Johnson Deficiency Report identified in detail the "[d]istinctive characteristics of petition sheets submitted by" the "fraudulent-petition circulators." (*Id.* at 2-4, PageID.57-59.)  And it further explained in detail the remaining issues.

7

(*See id.*)  The Report made no determination as to whether the Johnson Petitions were, as required by Mich. Comp. Laws § 168.53, signed by at least 100 registered resident electors in each of at least half of the congressional districts of the state.

The Johnson Deficiency Report noted that 6,065 signatures were challenged in the Bray Complaint.  (*Id.* at 6, PageID.62.)  The Bray Complaint "was not processed," however, because the circulators named in the Bray Complaint had already been identified by the Bureau as Fraudulent Petition Circulators, and the Bureau had already determined that Johnson had sufficient signatures.  (*Id.*)  The Report concluded by recommending that the Bureau determine Johnson had submitted "insufficient" petitions.  (*Id.*)

The Bureau presented both the Fraud Report and the Johnson Deficiency Report at a meeting of the Board on May 26, 2022.  The Board conducted a hearing that included presentations by counsel for Johnson and Bray and deliberations among members of the Board.  No further action was taken by the Board regarding the Johnson Petitions at the May 26, 2022 meeting of the Board.

## IV.  <u>Johnson Sues In State Court, and the Michigan Court of Appeals and Supreme Court Reject His Arguments.</u>

The day after the Board met, Johnson filed a complaint in the Michigan Court of Appeals.  (State Court Compl., **Ex. 3**.)  That 55-page Complaint took issue with the Bureau's and Board's investigation, and requested a writ of mandamus directing the defendants to "immediately take all necessary measures to place Perry Johnson's

8

name on the ballot[.]"  (*Id.* at 53.)  The complaint represented that "June 3, 2022 represents a hard deadline for perfection of his appellate remedies from both [the Court of Appeals] and the Michigan Supreme Court" in order for him to appear on the ballot.  (*Id.* ¶ 206.)  The complaint alleged that the Board violated its clear legal duty to compare every signature submitted by the fraudulent petition circulators against the QVF before discarding those signatures seeking an order placing him on the primary ballot.  The complaint further argued that Johnson "has a fundamental right to seek public office," and that by leaving him off the ballot, the defendants violated his due process rights.  (*Id.* ¶ 144.)  Johnson never alleged that the Michigan Election Law's signature requirement was itself unconstitutional.

A unanimous panel of the Michigan Court of Appeals ruled against Johnson in a published opinion.  *Johnson v Board of State Canvassers*, --- N.W.2d ---, No. 361564, 2022 Mich. App. LEXIS 3139 (June 1, 2022).  The Court rejected his argument that each signature had to be compared against the QVF.  *Id.* at *19, 21. And, although it did "not reach the merits of Johnson's due process claim," the court took care to "note that he was provided with the names of each of the fraudulent-petition circulators, was told how many signatures they had collected that were invalidated, and was made aware that each and every signature submitted by those individuals have, in fact, been invalidated."  *Id.* at *21 n.8.  "Based on that information," it was "clear that he was provided with notice as to what signatures

were being invalidated and the basis for which they were being invalidated. He was also provided with a meaningful opportunity to challenge the finding of invalidity at the May 26, 2022 hearing before the Board." *Id.*

Johnson then appealed to the Michigan Supreme Court, where the justices quickly and overwhelmingly declined to accept the application for leave to appeal. *Johnson v Bd of State Canvassers*, --- N.W.2d ---, No. 164461, 2022 Mich. LEXIS 1112 (June 3, 2022).

As set forth above, Johnson learned of potential issues with the fraudulent petition circulators affecting his nominating petitions no later than April 26, 2022. Additionally, the names of eight circulators accused of fraud were publicly reported on April 29. See Neavling, *James Craig's 'gang of forgers' also committed fraud for another campaign, complaint alleges*, DETROIT METRO TIMES (April 29, 2022) <https://www.metrotimes.com/news/james-craigs-gang-of-forgers-also-committed-fraud-for-another-campaign-complaint-alleges-29923800> (accessed May 31, 2022). Put simply, Johnson was aware of the fraudulent petition circulators. Johnson had the opportunity to respond to the Bray Complaint to the Bureau. Johnson was on notice of the Bureau's recommendation as of May 23. Johnson had the opportunity to present argument at the Board of Canvassers' May 26 meeting. He has made his case to the Court of Appeals without success. *Johnson,* 2022 Mich. App. LEXIS 3139. His appeal to the Michigan Supreme Court also was

10

unsuccessful. *Johnson,* 2022 Mich. LEXIS 1112.

For more than a month, Johnson has been on notice of the issues with his petitions, and after numerous opportunities to respond with numerous pages of pleadings submitted to the Board, the Michigan Court of Appeals, the Michigan Supreme Court, and now this Court, Johnson has yet to identify a single signature that was improperly rejected by the Bureau.

## V.   **Johnson Seeks Another Bite at the Apple, and Sues in Federal Court.**

After exhausting all state court remedies, and waiting until after the Secretary of State finalized the official list of candidates appearing on the primary ballot on June 3rd, Johnson filed this lawsuit anyway.  He seeks (1) for the first time, a declaration that portions of Michigan's ballot access laws are unconstitutional; (2) the extraordinary relief of a temporary restraining order and/or preliminary injunction barring Defendants from enforcing the 15,000 valid signature requirement; (3) an order requiring Defendants to reduce the signature requirement in contravention of state statutes, or placing Johnson on the primary ballot; and (4) an order for the Secretary of State to immediately cease the printing of August 2022 primary ballots (even though responsibility for printing ballots is not vested in the Secretary of State under Michigan law).

Proposed Intervenor Bray respectfully requests this Court to deny the relief requested by Johnson because he is not legally entitled to relief.

11

## LEGAL STANDARDS

Johnson seeks a temporary restraining order or preliminary injunction barring Defendants from enforcing the requirement that nominating petitions included at least 15,000 valid signatures from registered voters.  In determining whether the requested relief is appropriate, the Court must consider whether: (1) "the movant has shown a strong likelihood of success on the merits"; (2) "the movant will suffer irreparable harm if the injunction is not issued"; (3) "the issuance of the injunction would cause substantial harm to others"; and (4) "the public interest would be served by issuing the injunction." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

Johnson bears the burden of "proving that the circumstances clearly demand" injunctive relief.  *Id*.  This burden requires a "clear showing" that each factor is met, and the "burden of proof" is "more stringent than the proof required to survive a summary judgment trial." *Enchant Christmas Light Maze & Mkt. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020).  "A finding that there is simply no likelihood of success on the merits is usually fatal to a plaintiff's quest for a preliminary injunction." *Id.* (cleaned up).

## ARGUMENT

**I.**    **This Court Should Decline to Alter Michigan's Election Law at the 13th Hour.**

Before reaching the merits of Johnson's claim, it is worth noting that the

extreme relief sought by Johnson would require this federal court to alter Michigan's election requirements at this late hour – well past the June 3rd deadline that Johnson represented was necessary to obtain relief in Michigan's state courts.

The Supreme Court has repeatedly emphasized that federal courts "should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam); *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (per curiam). This principle, sometimes referenced as the "*Purcell* Principle" applies here. Michigan's August 2, 2022 primary election is already underway. The Secretary of State was required to certify eligible candidates for that election by June 3, 2022 under Mich. Comp. Laws § 168.552(14). *Johnson v. Bd. of State Canvassers*, --- Mich. ---, 2022 Mich. LEXIS 1112, at *7 (Mich. June 3, 2022) (Bernstein, J., dissenting). Based upon that list of eligible candidates, county and local clerks are already preparing and printing ballots so that the constitutional and statutory deadlines for delivery of ballots can be met.

County clerks must deliver absent voter ballots for the August 2, 2022 primary election to city, township, and village clerks by June 18, 2022. Mich. Comp. Laws § 168.714. Also on June 18, 2022, county, city, township, and village clerk must transmit an absent voter ballot to each absent uniformed services voter or overseas voter applying for an absent voter ballot for the August 2nd primary election. MICH. CONST., art IV, § 1(b); Mich. Comp. Laws § 168.759a(5). Beginning on June 23,

13

every registered voter in Michigan has the constitutional right to vote an absent voter ballot for the August 2, 2022 primary election.  MICH. CONST., art IV, § 1(g).

In addition, by waiting until June 6, 2022 to seek relief from this Court, Plaintiffs has in some way created a need for the emergency relief requested. See *Morgan v. White*, 964 F.3d 649, 651 (7th Cir. 2020) (per curiam).  Plaintiff's prior counsel was present at the Board's May 26 meeting, and was aware on that date of both the action taken by the Bureau and the Board that Plaintiff now challenges, as well as the Bureau's announced statutory deadline of June 3, 2022 for finalizing the official list of candidates that would appear on the ballot at the August 2nd primary election.  See *Benisek v. Lamone*, 138 S. Ct. 1942, 1944–45 (2018) (per curiam); cf. *Little v. Reclaim Idaho*, 140 S. Ct. ---, 2020 WL 4360897, at *2617 (2020) (Roberts, C.J., concurring in the grant of stay of state certification of ballot initiative without the requisite number of signatures).

Rewriting state election procedures and moving deadlines as Johnson requests rarely, as noted by the Sixth Circuit, "ends with one court order" and "moving one piece on the game board invariably leads to additional moves."  *Thompson v. Dewine*, 959 F.3d 804, 813 (6th Cir. 2020).  The Court should heed this warning and, consistent with the *Purcell* Principle, avoid disrupting the administration of Michigan's August 2nd primary election and deny Johnson's request to interfere with state preparations for that election.

14

II.     **Johnson Is Not Likely to Succeed on the Merits of His Claims.**

Even if this Court were inclined to entertain Johnson's request for relief, he has failed to meet the demanding burden of obtaining relief through a temporary restraining order or preliminary injunction.

A.      **Johnson's First Amendment Claim Lacks Merit.**

Johnson first argues that Michigan's signature requirements are unconstitutional as applied.  This argument should be rejected for several reasons.

1.     Johnson Failed to Raise this Argument in State Court.

As a threshold matter, it is important to note that Johnson filed a 55-page complaint in Michigan's Court of Appeals, which never alleged that Michigan's signature requirements are unconstitutional.  (**Ex. 3**.)  "When determining the preclusive effect of a state-court judgment, federal courts must look to that state's law and give the 'judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered.'"  *Scott v. Reif*, 659 F. App'x 338, 342 (6th Cir. 2016).  "Under Michigan law, res judicata . . . bars a subsequent action when '(1) the prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, or could have been, resolved in the first.'"  *Id.* (cleaned up).

Here, the state court action was decided on the merits and proceeded fully through Michigan's highest court.  *Johnson*, 2022 Mich. App. LEXIS 3139, at *22 ("Johnson's complaint for mandamus is denied on the merits.").  The state court case

15

involved the exact same parties as this case does. And Johnson's claim that Michigan's signature requirement is unconstitutional "could have been" raised in the first action. He just chose not to. Thus, there is no need for this Court to reach the merits of the claim.

2.  Michigan's Signature Requirement Laws Meet the *Anderson-Burdick* Test.

Even if this Court does reach the merits, the claim still fails. State restrictions on access to election ballots can potentially burden two different rights: "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983) (quoting *Williams v. Rhodes*, 393 U.S. 23, 30 (1968)). These rights are protected by the First Amendment, as incorporated into and applicable to states under the Fourteenth Amendment. However, "[t]he right to vote in any manner and the right to associate for political purposes through the ballot [are not] absolute," and "States retain the power to regulate their own elections." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).

In determining the constitutionality of state election procedures, federal courts typically weigh "the character and magnitude of the asserted injury" against "the precise interests put forward by the State as justifications for the burden imposed by its rule." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). A plaintiff

16

in Johnson's position bears the burden of making a factual showing of injury. *Democratic Party of Haw. v. Nago*, 833 F.3d 1119, 1123–24 (9th Cir. 2016).

If a plaintiff's constitutional rights are subject to "severe" restrictions, a state law must be "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434. When a state law imposes "reasonable, nondiscriminatory restrictions" on the rights of voters, a state's "important regulatory interests are generally sufficient to justify" the law. *Id*. (quoting *Anderson*, 460 U.S. at 788). When a state law imposes an intermediate restriction somewhere between those two points on a spectrum, federal courts "weigh the burden imposed by the State's regulation against 'the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Thompson v. DeWine*, 959 F.3d 804, 808 (6th Cir. 2020) (per curiam) (quoting *Burdick*, 504 U.S. at 434).

In *Esshaki v. Whitmer*, the Sixth Circuit determined that strict application of Michigan's ballot-access laws to primary-election candidates, when combined with a stay-at-home order issued by the state in response to the COVID-19 pandemic, imposed a severe burden on constitutional rights. 813 F. App'x 170, 171-172 (6th Cir. 2020). In *Thompson*, the Sixth Circuit determined that Ohio's ballot-access laws, when combined with COVID-19 restrictions, placed an intermediate burden on First and Fourteenth Amendment rights when seeking to qualify local initiatives

17

and a constitutional amendment to the November ballot. 959 F.3d at 809–11.

Here, the burden is substantially less. No stay-at-home order or COVID-19 restrictions affected Johnson's ability to collect valid signatures from registered voters. He had the unfettered ability to collect valid signatures and examine the quality of the signatures collected from the day he announced candidacy until the April 19, 2022 deadline for the submission of nominating petitions. He had the ability to avoid the use of fraudulent petition circulators and to refrain from submitting invalid signatures—just as six other candidates have done. Johnson has not shown that the claimed burden imposed by Michigan's statutory requirements to access the August 2, 2022 primary election ballot is either severe or intermediate or any way unique as applied to him.

Under Michigan law, as a gubernatorial candidate seeking the nomination of a major political party, Johnson was required to submit the valid signatures of 15,000 "qualified and registered electors," with at least 100 signatures from registered resident electors in each of at least half of the congressional districts of the state. Mich. Comp. Laws §§ 168.53, 168.544c. In *Jenness v. Fortson*, 403 U.S. 431, 438 (1971), the Supreme Court upheld a Georgia law requiring independent candidates to file a nominating petition signed by at least 5% of the number of registered voters in the last general election for the office in question. In comparison, Michigan's 15,000 minimum signature requirement is far less burdensome. That statewide

signature requirement is only 0.27% of the total statewide vote for President in 2020,[1] and only 0.18% of the current number of total registered voters in Michigan.[2] See *Ariz. Libertarian Party v. Hobbs*, 925 F.3d 1085, 1092 (9th Cir. 2019) (noting that courts consider the percentage of the total "available pool" of signers).

Other aspects of Michigan's requirements for major party candidate ballot access using nominating petitions impose relatively minor burdens. See *Jenness*, 403 U.S. at 438 (emphasizing that Georgia's law imposed no "suffocating restrictions" on petitions).  Nominating petitions for candidates seeking the nomination of a major political party for the office of governor had to be filed with the Secretary of State 105 days before the August 2, 2022 primary election.  Mich. Comp. Laws § 168.53. That deadline affords candidates more time for signature gathering than deadlines upheld elsewhere. *See, e.g., Ariz. Green Party v. Reagan*, 838 F.3d 983, 987, 992 (9th Cir. 2016) (upholding petition filing deadline 180 days before primary).

Moreover, for Johnson and voters seeking to support Johnson, Michigan law permits write-in votes, so voters have an opportunity to vote for their preferred candidate even when that preferred candidate does not qualify for a primary ballot

---

[1] Michigan Department of State, <https://mielections.us/election/results/2020GEN_CENR.html> (accessed June 7, 2022).

[2] Michigan Department of State, <https://mvic.sos.state.mi.us/VoterCount/Index> (accessed June 7, 2022).

using nominating petitions. Mich. Comp. Laws § 168.737a.  The current mayor of the City of Detroit, for example, was nominated by write-in votes at a primary election in 2013.  *See, Barrow v. City of Detroit Election Comm'n*, 836 NW.2d 498 (Mich. Ct. App. 2013).  Johnson also can seek election as an independent candidate, which requires only 12,000 valid signatures on nominating petitions.  Mich. Comp. Laws §§ 168.544f, 168.590c; *Graveline v. Benson*, 430 F. Supp. 3d 297, 318 (E.D. Mich. 2021), *aff'd* 992 F.3d 524 (6th Cir. 2021).  In addition, Johnson can seek nomination as a candidate for governor by one of Michigan's five minor political parties, which nominate gubernatorial candidates at summer conventions without the requirement of nominating petitions.  Mich. Comp. Laws §§ 168.532 and 168.686a. Therefore, Michigan law still permits Johnson to seek nomination as a Republican candidate for governor as a write-in candidate and affords multiple other opportunities for Michigan voters to support him as a either an independent gubernatorial candidate or a nominee of one of five minor political parties.

Johnson provides no evidence regarding how Michigan's 15,000 valid signature requirement or the distribution requirement imposed a severe burden either generally or as applied to him.  While he argues this requirement functions "as an absolute bar" to the ballot, six other gubernatorial candidates had no issue qualifying for the ballot under the same rules and procedures that Johnson objects to in this

case.[3]  Therefore, the state restrictions on access to Michigan's primary ballot are neither strict nor intermediate. Instead, they are reasonable and nondiscriminatory restrictions.  When a state law imposes "reasonable, nondiscriminatory restrictions" on the rights of voters, a states "important regulatory interests are generally sufficient to justify" the law.  *Id.* (quoting *Anderson*, 460 U.S. at 788).

After determining that state restrictions are both reasonable and nondiscriminatory, the *Anderson-Burdick* next requires consideration of "the State's justifications for the restrictions." *Schmitt v. LaRose*, 933 F.3d 628, 641 (6th Cir. 2019).  Because Michigan's primary ballot access laws as applied to Johnson are reasonable and nondiscriminatory, important regulatory interests are generally sufficient to justify the laws. *Anderson*, 460 U.S. at 788.

Two reasons justifying Michigan's ballot-access laws have previously been recognized as important or legitimate by the Sixth Circuit.  First, the valid signature requirement ensures that a candidate has a modicum of support before appearing on the ballot to further Michigan's interest in a fair and orderly election by avoiding ballot overcrowding, frivolous candidates, and voter confusion.  *Hawkins v. DeWine*, 968 F.3d 603, 607 (6th Cir. 2020); *Schmitt*, 933 F.3d at 641.  Second, Michigan's

---

[3] Michigan Department of State, *2022 Michigan Candidate Listing*, <https://mielections.us/election/candlist/2022PRI_CANDLIST.html> (accessed June 7, 2022).

DYKEMA GOSSETT PLLC • Capitol View, 201 Townsend Street, Suite 900, Lansing, Michigan 48933

filing deadline for nominating petitions is essential to ensure an orderly, timely election.  See *Kishore v. Whitmer*, 972 F.3d 745, 750-751 (6th Cir. 2020); *Hawkins*, 968 F.3d at 607; *Thompson*, 959 F.3d at 811; *Esshaki*, 813 F. App'x at 171.  Both state interests have been recognized as important and legitimate regulatory interests.

On balance, the strength of Michigan's well-established and legitimate interests in administering its primary elections through candidate-eligibility and ballot-access requirements outweigh any limited burden imposed on Johnson. Again, six other candidates were able to comply with this well-settled law.  Had Johnson's campaign exercised the needed diligence, he could have done so as well.

**B.      Johnson's Due Process Argument Lacks Merit.**

Johnson also argues he is likely to succeed on the merits of his argument that he "has been deprived of a fundamental right without due process."  (Johnson's Br. at 16, ECF No. 2, PageID.42.)  He claims he "has a fundamental right to seek public office" and that he was deprived of that right "without an opportunity to be heard in a meaningful manner."  (*Id.*)  He is wrong on both counts.

As both Michigan and federal courts have repeatedly recognized, there is no fundamental right to seek public office.  *Kowall v. Benson*, 18 F.4th 542, 549 (6th Cir. 2021) ("Just as candidates have no fundamental right to run for office, voters have no fundamental right to 'vote for a specific candidate or even a particular class of candidates.'"); *Eason v Whitmer*, 485 F. Supp. 3d 876, 882 (E.D. Mich. 2020)

22

("Plaintiff has no fundamental right to run for elected office or, as a voter, to vote for a specific candidate"); *Barrow v. City of Detroit Election Comm'n,* 836 N.W.2d 498 (2013) (finding that a person's "candidacy is not a fundamental right" and excluding candidate from the ballot).

Regardless, Johnson received ample procedural protections. The Michigan Election Law provides that, "[i]n case it is determined that the nominating petitions of any candidate do not comply with the requirements of this act . . . it shall be the duty of the secretary of state or county or city clerk to immediately notify such candidate of such fact, together with a statement of the reasons why his name was not certified . . ." Mich. Comp. Laws § 168.553. Here, Johnson learned of potential issues with the fraudulent petition circulators on April 26, 2022. He had the opportunity to respond to the challenge submitted by Bray to the Bureau. He learned of the Bureau's recommendation and the basis for those recommendations as of May 23. And he had the opportunity to present argument at the Board's May 26 meeting. He has made his case to the Court of Appeals, and to the Michigan Supreme Court. In short, Johnson has now been on notice of the issues with his petitions for over a month, and has had numerous opportunities to dispute those issues. He has failed to do so.

Thus, as the Court of Appeals has already held, it is "clear that he was provided with notice as to what signatures were being invalidated and the basis for

which they were being invalidated. He was also provided with a meaningful opportunity to challenge the finding of invalidity at the May 26, 2022 hearing before the Board." *Johnson*, 2022 Mich. App. LEXIS 3139. at *21 n.8.

### III. Any Harm to Johnson is the Result of His Own Negligence, and the Issuance of an Injunction Will Cause Substantial Harm to Others.

In deciding whether to grant an injunction, courts next look to whether the movant will suffer irreparable harm if the injunction is not issued, and whether the issuance of an injunction would cause substantial harm to others.

Here, while Johnson may argue that he will suffer harm from not appearing on the ballot, that harm is his own doing. Incredulously, Johnson argues that he was prevented from appearing on the ballot "through no fault of his own." (Johnson's Br. at 8, ECF No. 2, PageID.34.) But Johnson has not disputed that he submitted thousands of fraudulent signatures or paid for petition circulators that engaged in fraudulent activity. Put simply, any harm to Johnson in failing to meet the Election Law's requirements is the result of his own campaign's failure to ensure that the signatures it submitted were not fraudulent.

In contrast, if an injunction is issued, Michigan's primary election will be up-ended. Candidates who complied with the law will appear on the ballot alongside candidates who did not. Michigan voters will face substantial confusion as to who valid candidates are. And Michigan's election administrators will be left to alter ballots that have been printed or will be imminently printed.

24

IV.   **An Injunction Is Not in the Public Interest.**

Finally, the public interest weighs in favor of correctly enforcing Michigan's

Election Law—as Michigan courts have done.

## CONCLUSION

"Confidence in the integrity of our electoral processes is essential to the

functioning of our participatory democracy." *Purcell*, 549 U.S. at 4.  Given the

documented nominating petition fraud engaged in by Johnson's employees and

agents and the fact that there has been no determination that he filed the statutorily

required number of valid signatures from registered voters, ordering the placement

of Johnson on the ballot for the August 2, 2022 primary election would undermine

confidence in the integrity of Michigan's electoral process.

This Court should reject Johnson's requested relief, which would effectuate a

plenary re-writing of Michigan ballot-access provisions to permit the counting of

fraudulent or otherwise invalid signatures on nominating petitions in a manner that

ignores important state interests relating to ballot access requirements and upend the

administration of Michigan's primary election.

By: /s/ *Gary P. Gordon*
Steven C. Liedel* (P58852)
*(*admission pending)*
Gary P. Gordon (P26290)
Kyle M. Asher (P80359)
DYKEMA GOSSETT PLLC
201 Townsend Street, Suite 900
Lansing, MI 48933
(517) 374-9184

26

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1</u>

I, Gary P. Gordon, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 (for proportional fonts).  I also certify that it is the appropriate length. Local Rule 7.1(d)(3).

By: /s/ *Gary P. Gordon*
*Attorney for Defendants*

DYKEMA GOSSETT PLLC • Capitol View, 201 Townsend Street, Suite 900, Lansing, Michigan 48933

## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2022, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, and that a copy has been served via U.S. Mail, to any non-ECF users.

Respectfully submitted,

Dated:  June 10, 2022                     Dykema Gossett PLLC

By: /s/ *Gary P. Gordon*
Steven C. Liedel* (P58852)
(*admission pending)
Gary P. Gordon (P26290)
Kyle M. Asher (P80359)
DYKEMA GOSSETT PLLC
201 Townsend Street, Suite 900
Lansing, MI 48933
(517) 374-9184

119963.000002  4874-3017-8852.4

2