UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PERRY JOHNSON,

     Plaintiff,                     No. 2:22-cv-11232

v

                                       HON. MARK A. GOLDSMITH

MICHIGAN BOARD OF STATE
CANVASSERS; JOCELYN BENSON,      MAG. JONATHAN J.C. GREY
in her official capacity as Secretary of
State; and JONATHAN BRATER, in
his official capacity as Director of the
Michigan Bureau of Elections,

     Defendants.

_____/

Eric S. Esshaki (P83393)           Kyle M. Asher (P80359)
Attorney for Plaintiff              Attorney for Proposed
                                 Intervenor Bray

38500 Woodward Avenue, Suite 330   201 Townsend St., Suite 900
Bloomfield Hills, Michigan 48304     Lansing, Michigan 48933
313.460.1421                        517.374.9151
eric@esshakilegal.com            kasher@dykema.com

Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Attorneys for Defendant
P.O. Box 30736
Lansing, Michigan 48909
517.335.7659
meingasth@michigan.gov
grille@michigan.gov

_____/

**STATE DEFENDANTS BRIEF IN OPPOSITION TO
PLAINTIFF'S REQUEST FOR TEMPORARY RESTRAINING
ORDER/PRELIMINARY INJUNCTION**

Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Attorneys for Defendant
P.O. Box 30736
Lansing, Michigan 48909
517.335.7659
meingasth@michigan.gov
grille@michigan.gov

Date: June 10, 2022

# TABLE OF CONTENTS

<u>Page</u>

Table of Contents ....................................................................................i

Index of Authorities............................................................................. iii

Concise Statement of Issue Presented.....................................................vi

Introduction........................................................................................1

Counter-Statement Of Facts...................................................................2

    A.    Overview of the Director of Elections and Board of State Canvassers' duties with respect to nominating petitions............................................................................2

        1.    The Director of Elections' duties.....................................2

        2.    The Board of State Canvassers' duties..........................3

    B.    The canvass of Plaintiff's petition and the petitions of other candidates affected by fraud. ........................................5

    C.    State Court litigation ...............................................................18

Argument..........................................................................................19

I.    The request for temporary or preliminary injunctive relief should be denied where none of the factors are met. ....................19

    A.    Plaintiff's motion for temporary or preliminary injunctive relief should be denied where Plaintiff's claims are barred by the doctrine of laches.........................20

    B.    Plaintiff has not demonstrated a substantial likelihood of success on the merits of his constitutional claims. ..........29

        1.    Plaintiff has not established a likelihood of success on his First Amendment claim. ......................30

1.    Plaintiff has not established a likelihood of
            success on his procedural due process claim. .............. 38

C.    Plaintiff has not shown irreparable harm. ........................... 45

D.    Issuance of a temporary or preliminary injunction
      would harm the State Defendants, local clerks, and the
      citizens of this State, and would be contrary to the
      public interest. ................................................... 45

Conclusion and Relief Requested ........................................... 47

# INDEX OF AUTHORITIES

Page

## Cases

*American Party of Texas v. White*, 415 U.S. 767 (1974) .........................34

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ...........................................31

*Automobile Club of Michigan Committee for Lower Rates Now v Secretary of State (On Remand)*, 195 Mich App 613; 491 NW2d 269 (1992) .......................................................................................4

*Brown-Graves Co. v. Central States, Southeast and Southwest Areas Pension Fund*, 206 F.3d 680 (6th Cir. 2000) .............................21

*Burdick v. Takushi*, 504 U.S. 428 (1992) .................................................31

*Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008)...................31

*Crookston v. Johnson,* 841 F.3d 396 (6th Cir. 2016) .............................22

*Deleeuw v State Bd of Canvassers*, 263 Mich App 496 (2004).................3

*Enchant Christmas Light Maze & Market Ltd. v. Glowco, LLC*, 958 F.3d 532 (6th Cir. 2020) ...............................................................19

*Gillis v Bd of State Canvassers*, 453 Mich 881 (1996).............................4

*Gillis v Bd of State Canvassers*, 453 Mich 881; 554 NW2d 9 (1996)........4

*Green Party of Tenn. v. Hargett (Hargett I)*, 767 F.3d 533 (6th Cir. 2014) .......................................................................................33

*Green Party of Tenn. v. Hargett (Hargett II)*, 791 F.3d 684 (6th Cir. 2015) .......................................................................................32

*In re Eagle-Picher Indus., Inc.* 963 F.2d 855 (6th Cir. 1992) .............................................................20

*Jenness v. Forton*, 403 U.S. 431 (1971).....................................................34

*Leininger v Secretary of State*, 316 Mich 644; 26 NW2d 348 (1947) ........ 4

*Lucking v. Schram*, 117 F.2d 160 (6th Cir. 1941) ................................... 20

*Munro v. Socialist Workers Party,* 479 U.S. 189 (1986) ......................... 34

*Nader v. Blackwell*, 230 F.3d 833 (6th Cir. 2000) ............................ 23, 46

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345
(1977) ............................................................................................. 46

*Nken v. Holder*, 556 U.S. 418  (2009) ...................................................... 45

*Ohio Council 8 Am. Fed'n of State v. Husted*, 814 F.3d 329 (6th
Cir. 2016) ......................................................................................... 33

*Ohio Democratic Party v. Husted*, 834 F.3d 620 (6th Cir. 2016) ...... 32, 33

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 206 L.Ed.2d
452 (2020) ........................................................................................ 22

*Sandison v. Michigan High School Athletic Association, Inc.*,
64 F.3d 1026 (6th Cir. 1995) .............................................................. 20

*Storer v. Brown*, 415 U.S. 724 (1974)...................................................... 31

*Texas v. Camenisch*,
451 U.S. 390 (1981) .......................................................................... 19

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997).............. 34

*Willman v. United States Off. of Att'y Gen.,* No. 19-10360, 2019
WL 2402940, at *1 (E.D. Mich. June 7, 2019) .................................... 19

*Ypsilanti Twp. Citizens for Responsible Gov't v. Benson,* No. 5:22-
CV-10975, 2022 WL 1444435, at *2 (E.D. Mich. May 6, 2022) ........... 20

## Statutes

MCL 168.32(1) ....................................................................................... 2, 4

MCL 168.34 ............................................................................................... 2

MCL 168.509gg(1)(f) ........................................................................ 44

MCL 168.552(8) ................................................................................ 3

MCL 168.552(9) ......................................................................... 4, 44

MCL 168.841 ..................................................................................... 3

**CONCISE STATEMENT OF ISSUE PRESENTED**

1.  Should the extraordinary relief of a temporary restraining order or preliminary injunction be granted here where Plaintiff is not likely to succeed on her challenge to the constitutionality of the challenged statutes and procedures and the remaining factors weigh in favor of Defendants?

## INTRODUCTION

Plaintiff Perry Johnson is a gubernatorial candidate who failed to obtain access to Michigan's August 2022 primary ballot due to the submission of thousands of fraudulent signatures.

After being denied relief by the Michigan Court of Appeals and the Michigan Supreme Court, Plaintiff filed a complaint and motion for injunctive relief in this Court.

But his complaint, which raises no legal claims that could not have been made immediately after the May 26 Board of State Canvassers meeting, comes well-after the Secretary of State's June 3 certification of candidates, including gubernatorial candidates, to Michigan's 83 counties, and well-into the ballot printing process.  In fact, several of the State's most populous counties—Kent, Macomb, Oakland, Livingston and Washtenaw—have already begun printing ballots.  Any order placing Plaintiff on the ballot now would require these counties and likely dozens of others, to expend the time and cost of re-printing ballots.

Further, there is almost no chance that reprinting could be done by the affected counties in time for local clerks to comply with statutory

and constitutional deadlines to make absent voter ballots available

voters, including military and overseas voters.

Plaintiff is simply too late.  Where he has slept on his alleged

constitutional rights, and offered no compelling reason for his late

filing, this Court should deny relief based on the doctrine of laches.  A

plethora of legal precedents supports, if not compels, this Court to do so.

But even if this Court were inclined to review the substance of his

claims, Plaintiff has demonstrated no likelihood of success on the merits

of his First Amendment and Due Process Clause claims.  His motion for

injunctive relief must be denied for this reason as well.

## COUNTER-STATEMENT OF FACTS

**A.    Overview of the Director of Elections and Board of State Canvassers' duties with respect to nominating petitions.**

### 1.    The Director of Elections' duties.

The Director of Elections is appointed by the Secretary of State

and supervises the Bureau of Elections.  MCL 168.32(1), MCL 168.34.

The Director of Elections is "vested with the powers and shall perform

the duties of the secretary of state under . . . her supervision, with

respect to the supervision and administration of the election laws."  *Id.*

As "a nonmember secretary of the state board of canvassers," the

Director of Elections supervises the Bureau as it assists the Board in canvassing petitions, like the Johnson petition. *Id.*

### 2. The Board of State Canvassers' duties.

The Board is a bi-partisan constitutional board created by Const 1963, art 2, § 7, and its duties and responsibilities are established by law. See MCL 168.22, MCL 168.841. The Legislature has empowered the Board to enforce the technical requirements set forth in the Michigan Election Law relating to the circulation and form of various petitions, including candidate nominating petitions. "The Board of State Canvassers' authority and duties with regard to [nominating] petitions are set forth at MCL 168.552(8)." *Deleeuw v State Bd of Canvassers*, 263 Mich App 496, 500-501 (2004). MCL 168.552(8) "provides that the board's sole duty regarding qualifying petitions is to determine whether the signatures on the petitions are valid, including those of the people who circulate the petitions, whether they are the signatures of registered voters, and whether there are sufficient valid signatures to certify the petitions." *Id.*

These duties are generally ministerial in nature, and in reviewing a petition the Board considers the form of the petition sheet and

3

whether they possess the requisite number of valid signatures by registered electors. *Leininger v Secretary of State*, 316 Mich 644, 655-656 (1947).  See also *Gillis v Bd of State Canvassers*, 453 Mich 881 (1996); *Automobile Club of Michigan Committee for Lower Rates Now*, 195 Mich App at 624 (1992) ("[T]he Board of State Canvassers possesses the authority to consider questions of form.").

The Board's duties with respect to candidate petitions are two-fold.  First, under MCL 168.552(8), the Board must canvass the petition to ascertain if the petition has been signed by the requisite number of qualified and registered voters.  The Board's canvassing duties are carried out by staff at the Bureau of Elections under the supervision of the Director of Elections.  MCL 168.32(1), 168.34.  The Board must complete its canvass of nominating petitions 9 weeks before the August 2, 2022, primary, which is May 31.  MCL 168.552(9).  Second, under MCL 168.552(11), the Board must make "[a]n official declaration of the sufficiency or insufficiency of a nominating petition . . . not less than 60 days before the primary election at which candidates are to be nominated."  That deadline is June 3 for this election cycle.  Essentially,

the Board determines whether the petition has enough valid signatures,

and whether the petition is in the proper form.

### B.   The canvass of Plaintiff's petition and the petitions of other candidates affected by fraud.

Plaintiff Perry Johnson is a gubernatorial candidate seeking to

qualify for the August 2022 primary election.  Plaintiff filed his

nominating petition on April 19, 2022 deadline.

As noted above, the Bureau of Elections, as supervised by the

Director of Elections, performs the canvass of nominating petitions on

behalf of the Board. The attached affidavit of the Director of Elections

thoroughly explains the Bureau's discovery of fraud in the circulation of

candidate petitions (including those submitted by Plaintiff), the process

used by the Bureau to canvass these petitions, and the results of the

canvass.  (Ex A, Brater Aff.)[1]  The Director urges the Court to carefully

review the affidavit, as only a portion of its contents will be described

here. As noted in the affidavit, the Director also urges the Court to

order the Director to provide the Court with the petition sheets and

---

[1] The paragraphs referenced to Director Brater's affidavit in this brief may differ from the paragraphs in the attached affidavit as Defendants prepared a slightly different affidavit for this case, but did not have time to cross-reference the paragraphs before having to file this brief.

signature images contained in the Qualified Voter File, so the Court can see the obvious fraud in the petition.

In late March, Bureau staff began canvassing the nominating petition filed by gubernatorial candidate Michael Markey.  During face review of Mr. Markey's petition, staff noticed that many petition sheets consisted entirely of signatures that appeared to be in the handwriting of the same individual or of a small group of individuals.  Staff also noticed one or more indications of fraud among these petition sheets, explained in detail in the Bureau's May 23, 2022 *Staff Report on Fraudulent Nominating Petitions*.  (Ex A, Brater Aff, ¶ 27; Appendix 2.) The indications of fraud identified were:

a. An unusually large number of petition sheets where every signature line was completed;

b. An unusually large number of petition sheets that showed no evidence of normal wear that accompanies circulation, including folding, scuffing, water damage, etc.;

c. Sheets that appeared to be "round-tabled", a practice in which a group of individuals passes around sheets with each individual signing one line on each sheet so that the handwriting is different from the circulator's handwriting, in an attempt to make handwriting and signatures appear authentic and received from actual voters;

     d. Sheets on which every instance of the handwriting of certain letters across different signatory lines and sheets, including in the signatures themselves, was near-identical;

     e. Sets of sheets where two or more distinct handwriting styles appeared on multiple sheets.

Staff also noticed that a small number of circulators had signed these petition sheets. *Id.* At this point, staff performed an initial spot check and verified that dozens of these signatures did not match the signature of the voter contained in the QVF, that these signatures belonged to individuals who were not registered to vote in Michigan, or that the signatures belonged to individuals who had died prior to the date of the signature. *Id.*, ¶ 28.

Rather than continuing with face review of the nominating petition submitted by Mr. Markey, staff counted the number of the petition signatures appearing on petition sheets signed by the small group of circulators, hereinafter referred to as fraudulent-petition circulators, and separated these from the remaining sheets. *Id.*, ¶ 29.

After subtracting the number of signatures appearing on petition sheets signed by the fraudulent-petition circulators from the number of signatures submitted by Mr. Markey, the candidate was left with 4,430 facially valid signatures; 10,570 signatures below the 15,000 signatures

required to be certified to the ballot as a gubernatorial candidate. (*Id.*, ¶ 30; Appendix 3, Markey Staff Report). Because Mr. Markey was 10,570 signatures below the number required to be certified to the ballot after the signatures on petition sheets signed by the fraudulent-petition circulators were removed from Mr. Markey's petition, staff did not continue with face review of Mr. Markey's remaining facially valid petitions. *Id.*, ¶ 32.

Bureau staff did not become aware of large-scale fraud in the petition of any other candidate until mid-April, when staff began to review petitions for judicial candidate Tricia Dare, who submitted her nominating petition on April 7. *Id.*, ¶ 33.

After staff began face review of Ms. Dare's petition, staff noticed indications of fraud similar to those they had noticed in Mr. Markey's petition. Again, staff performed a spot check and compared dozens of suspicious signatures against the signatures contained in the QVF. As with Mr. Markey's petitions, staff found that the signatures did not match the signature in the QVF, the purported signer was not registered in Michigan, or the purported signer was deceased prior to the date of the signature. *Id.*, ¶ 34.

8

Staff counted the number of the petition signatures appearing on petition sheets signed by the fraudulent-petition circulators and subtracted 4,038 signatures from the total signatures submitted by Ms. Dare.  This brought Ms. Dare 825 signatures below the 4,000 signatures required to be certified to the ballot as a judicial candidate for the position sought by Ms. Dare.  Staff face review of the remaining signatures in each petition did not affect whether these candidates had a sufficient number of valid signatures.  (*Id.*, ¶ 35; Appendix 3, Dare Staff report.)

Upon review, many of the names appearing on the circulator certificate of the fraudulent-petition circulators in Ms. Dare's petition matched the names appearing on the circulator certificate of the fraudulent-petition circulator sheets in Mr. Markey's petition.  Both Mr. Markey and Ms. Dare's petitions also included fraudulent-petition circulators that the other did not. *Id.*, ¶ 36.

After the April 19 filing deadline passed, staff began to process petitions submitted by Donna Brandenburg, Michael Brown, James Craig, Perry Johnson, and John Malone.  At this point, staff noticed that the fraud detected in Mr. Markey and Ms. Dare's petitions was

present in these additional five petition drives and involved many of the same fraudulent-petition circulators. *Id.*, ¶ 37.

Following the same procedure used with Mr. Markey and Ms. Dare's nominating petitions, staff determined for each of Ms. Brandenburg's, Mr. Craig's, Mr. Brown's, Mr. Malone's, Mr. Cavanagh's, and Mr. Johnson's petitions, the number of signatures on sheets where the name of a fraudulent-petition circulator appeared in the circulator's certificate. Staff subtracted those signatures from the number of potentially valid signatures submitted by the candidate. Separation and counting of signatures was conducted primarily after the May 6 deadline for candidates to respond to challenges and was not complete until approximately May 13; only at this time did staff have a complete estimate of the total number of signatures submitted by fraudulent-petition circulators. For Ms. Brandenburg's, Mr. Brown's, Mr. Craig's, and Mr. Malone's petition subtraction of these signatures from the number of potentially valid signatures submitted by the candidate dropped the candidate far below the threshold required to be certified to the ballot. *Id.*, ¶ 39.

For Plaintiff's petition, subtraction of signatures appearing on sheets where the name of a fraudulent circulator appeared on the circulator's certificate, 6,983, did not bring the number of potentially valid signatures remaining below the threshold required to be certified to the ballot. (*Id.*, Appendix 3, Johnson Staff Report).  Consequently, staff began a face review of Plaintiff's remaining signatures. *Id.*, ¶ 40.

After this face review, Plaintiff's petition was determined to have 13,800 facially valid signatures; 1,200 facially valid signatures short of the 15,000 signatures required for certification to the ballot as a gubernatorial candidate.  In total, 2,410 signatures on Plaintiff's petition that were determined to be invalid for reasons other than being circulated by a fraudulent-petition circulator, such as jurisdictional errors, date errors, etc are summarized in Plaintiff's staff report.  (*Id.*, ¶ 41; Appendix 3, Johnson Staff Report.)  Because Plaintiff was below the threshold to be certified to the ballot, staff did not process the challenge made to Plaintiff's signatures by Carol Bray.  *Id.*, ¶ 42.

After Bureau staff performed the above steps, the staff conducted additional reviews.  Under the supervision of staff members with experience in signature review, staff reviewed every sheet submitted by

a fraudulent-petition circulator for all eight candidates identified above. Staff looked at each line individually to determine if any of the individual signatures appeared to be genuine despite the indications of fraud found on the sheet. Following this review, staff determined that the petition sheets submitted by fraudulent-petition circulators consisted entirely of forged signatures. *Id.*, ¶ 44.

Staff considered the possibility that despite the overwhelming evidence of fraud, and the fact that no individual signatory lines reviewed by staff appeared distinct in such a way as to suggest the signature was genuine, it remained possible that some number of genuine signatures were mixed in with the forged entries submitted by the fraudulent-petition circulators. *Id.*, ¶ 45.

As an additional check, to further verify that there was no indication of genuine signatures submitted by fraudulent-petition circulators on the scale that would be necessary for any of the candidates to have a sufficient number of valid signatures with the inclusion of those signatures, staff looked up as many individual signatories as possible in the QVF. When staff began to verify

individual signatures against the QVF, staff did not know how many signatures they would have time to look up. *Id*., ¶ 46.

In total, staff reviewed in the QVF at least 6,876 supposed signatories appearing on sheets submitted by fraudulent-petition circulators for candidates who had fraudulent-petition circulators in common. Staff did not identify a single valid registered voter with a matching signature across any of these supposed signatories. Among the candidates with overlapping fraudulent-petition circulators, the number that the Bureau has documented as confirmed in the QVF are as follows. The percentage of fraudulent signatures reviewed is not uniform among candidates because there was a wide variance between the number of fraudulent signatures each candidate submitted and because, when reviewing signatures, staff attempted to look up a higher number of signatures for candidates who would need a smaller percentage of fraudulent-circulator petition signatures to be valid in order to have a sufficient number of valid signatures on the ballot:

     a. Donna Brandenburg: 1,014 out of 11,144 fraudulent signatures QVF-verified (9.1%);

     b. Michael Brown: 393 out of 13,775 fraudulent signatures QVF-verified (2.9%);

   c.  James Craig: 2,019 out of 9,879 fraudulent signatures QVF-verified (20.4%);

   d.  Tricia Dare: 442 out of 4038 fraudulent signatures QVF-verified (10.9%);

   e.  Perry Johnson: 1,405 out of 6,983 fraudulent signatures QVF-verified (20.1%);

   f.  John Malone: 938 out of 5,566 fraudulent signatures QVF-verified (16.9%);

   g.  Michael Markey: 665 out of 17,134 fraudulent signatures QVF-verified (3.8%) [*Id.*, ¶ 47.]

In checking the supposed signatories against the QVF, staff first determined the voter's name and other identifying information based on the written entry on the petition sheet.  If the handwriting was unclear, staff would try multiple versions of spellings of names to birth date entries to try to identify the individual.  For example, if it was not clear from the handwriting whether an individual's last name was "Jones" or "Jonas", staff would try both names.  *Id.*, ¶ 49.

In many cases, a registered voter with the name of the individual listed on the petition sheet could not be found in the QVF.  In many other cases, the individual's record was marked cancelled because the voter was deceased on a date prior to the date of the signature, or the

voter was registered in a different jurisdiction because the voter had moved prior to the date of the signature. *Id.*, ¶ 50.

In many other cases, a matching registered voter was found but staff found the signature did not match.  In making these comparisons, staff used and were instructed on the standards utilized by the Bureau to determine whether signatures match, which are available in the Bureau's guidance to candidates.  *Id.*, ¶ 51.[2]

For some of the circulators initially identified as potentially fraudulent-petition circulators, staff *did* find a small number of potentially valid signatures. When staff found any potentially valid signatures, they removed *all* of the circulator's sheets for *all* candidates from the category of fraudulent-petition circulators, and included those signatures with the facially valid signatures for those candidates, even though it appeared that many or most of the signature entries on those circulators' sheets were fraudulent.  *Id.*, ¶ 52.

---

[2] See Circulating and Canvassing Countywide Petition Forms , Nominating and Qualifying Petitions, April 2020, p 12, available at https://www.michigan.gov/sos/-/media/Project/Websites/sos/16delrio/SOS_ED105_County_Pet_Form.pdf?rev=daee67c93fb24f5e95c14a39d625ff95.

In total, across all seven campaigns with fraudulent-petition circulators in common, approximately 61,883 additional signatures were submitted by fraudulent-petition circulators.  It is not impossible that one or more of those 61,833 signatures is genuine, notwithstanding the fact that all 6,876 signatures that have been checked in the QVF are not.  It is also possible that, if the remaining 61,833 signatures were checked, one or more forged signatures would resemble the voter's actual signature out of pure chance.  However, if genuine signatures existed in these petitions on any scale significant enough to bring any of the candidates in question above the threshold of required signatures, staff would have identified some evidence of genuine signatures after having reviewed 6,876 of them. *Id.*, ¶ 53.

Based on the line-by-line review of all signatures submitted by fraudulent-petition circulators, the fact that none of the 6,876 signatures reviewed in the QVF showed a valid registered voter with a matching signature, staff determined that these 68,759 (61,883 + 6,876) signatures were obviously fraudulent, and that the circulators had knowingly and intentionally filed fraudulent signatures.  *Id.*, ¶ 54.

Director Brater presented the Bureau's findings and determinations to the Board through the Fraud Staff Report and the individual reports of the affected candidates, (*id.*, Appendices 2 & 3), and provided oral testimony and answered questions at the Board's May 26 meeting.  The Board also heard argument from counsel for all the candidates affected by fraud, including Plaintiff's counsel. Plaintiff's counsel also attempted to rehabilitee *one* signature (out of thousands) by providing an affidavit from the voter.  (*Id.*, ¶ 98; Appendix 5.)  But that affidavit did not demonstrate that the voter had signed the petition sheet in question; neither the signature on the affidavit not the signature in QVF matched on the petition.  *Id.*, ¶ 99-101.

Ultimately, after the presentation of this evidence, the Board did not agree on whether to declare the petitions impacted by fraud as insufficient (or sufficient), leading to the filing of the instant lawsuit, along with many others.

At the Board meeting, Director Brater specifically informed the Board and those present that the date of May 26 (rather than May 31, the latest possible date) had been chosen to allow time for court

challenges to be resolved by June 3.  Additionally, after the Board determined that Mr. Johnson and the other candidates had insufficient petitions because of fraudulent-petition circulator submissions, Director Brater stated that those who sought to appear on the ballot would need to file a lawsuit promptly.

### C.    State Court litigation

After the Defendant Board of State Canvassers was unable to certify Plaintiff's petition as sufficient or insufficient, Plaintiff filed on May 27 a complaint for mandamus with the Michigan Court of Appeals, arguing that the process utilized by the Bureau to canvass signatures was not authorized by law, including the determination to invalidate signatures without individual reviewing each signature.  (Ex B, COA Comp. w/o exs).  On June 1, the Court of Appeals denied relief in a published opinion, and the Michigan Supreme Court denied leave to appeal on June 3.  (Ex C, State Court orders).

On June 6, 2022, Plaintiff filed the instant complaint and motion for a temporary restraining order and preliminary injunctive relief.

# ARGUMENT

## I.   The request for temporary or preliminary injunctive relief should be denied where none of the factors are met.

Plaintiff has requested a temporary restraining order and/or a preliminary injunction.

A preliminary injunction is an extraordinary remedy, to which the movant must show a clear entitlement. *Enchant Christmas Light Maze & Market Ltd. v. Glowco, LLC,* 958 F.3d 532, 539 (6th Cir. 2020). Moreover, temporary restraining orders and preliminary injunctions are designed to protect the status quo pending final resolution of a lawsuit. *Willman v. United States Off. of Att'y Gen.,* No. 19-10360, 2019 WL 2402940, at *1 (E.D. Mich. June 7, 2019) (citing *University of Texas v. Camenisch*, 451 U.S. 390 (1981)).

The Court considers the following four factors in determining whether to issue a temporary restraining order or preliminary injunction: (1) whether the movant has shown a strong or substantial likelihood or probability of success on the merits; (2) whether the movant has shown that he or she would suffer irreparable harm if the preliminary relief is not issued; (3) whether the issuance of a preliminary injunction will not cause substantial harm to third parties;

19

and(4) whether the public interest would be served by the issuance of a preliminary injunction. *Sandison v. Michigan High School Athletic Association, Inc.*, 64 F.3d 1026, 1030 (6th Cir. 1995); *UASCO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 98 (6th Cir. 1982). The standard for injunctive relief is not a rigid and comprehensive test, as the four factors are not prerequisites that must be satisfied, but instead, must be balanced and are intended to "guide the discretion of the court; they are not meant to be rigid and unbending requirements." *Ypsilanti Twp. Citizens for Responsible Gov't v. Benson,* No. 5:22-CV-10975, 2022 WL 1444435, at *2 (E.D. Mich. May 6, 2022) (quoting *In re Eagle-Picher Indus., Inc.* 963 F.2d 855, 859 (6th Cir. 1992)). None of these factors are met here, and Plaintiff has not shown a clear entitlement to a preliminary injunction, which she must.

### A. Plaintiff's motion for temporary or preliminary injunctive relief should be denied where Plaintiff's claims are barred by the doctrine of laches.

Plaintiff's claims are barred by laches. The defense of laches is rooted in the principle that "equity aids the vigilant, not those who slumber on their rights." *Lucking v. Schram*, 117 F.2d 160 (6th Cir. 1941). An action may be barred by the equitable defense of laches if: (1)

the plaintiff delayed unreasonably in asserting their rights and (2) the defendant is prejudiced by this delay. *Brown-Graves Co. v. Central States, Southeast and Southwest Areas Pension Fund*, 206 F.3d 680, 684 (6th Cir. 2000).

Here, Plaintiff has unreasonably delayed raising his claims before this Court and the consequence of his delay prejudices the State Defendants.

"As a general rule, last-minute injunctions changing election procedures are strongly disfavored." *Serv. Employees Int'l Union Local 1 v. Husted*, 698 F.3d 341, 345 (6th Cir. 2012)(citing *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006)("Court orders affecting elections…can themselves result in voter confusion…As an election draws closer, that risk will increase.")); *William v. Rhodes*, 393 U.S. 23, 34-35 (1968) (affirming denial of request for injunction requiring last-minute changes to ballots, given risk of disrupting election process).

"As a general rule, last-minute injunctions changing election procedures are strongly disfavored." *Serv. Employees Int'l Union Local 1 v. Husted*, 698 F.3d 341, 345 (6th Cir. 2012)(citing *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006)("Court orders affecting elections…can themselves

result in voter confusion…As an election draws closer, that risk will increase.")); *William v. Rhodes*, 393 U.S. 23, 34-35 (1968) (affirming denial of request for injunction requiring last-minute changes to ballots, given risk of disrupting election process).  The Supreme Court reaffirmed that principle in *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 206 L.Ed.2d 452, 454 (2020) (staying portions of an injunction modifying process for mailing ballots on eve of primary election).  The Sixth Circuit has also recognized that the federal courts should not quickly "become entangled, as overseers and micromanagers, in the minutiae of state election processes."  *See Ohio Democratic Party v. Husted*, 834 F.3d 620, 622 (6th Cir. 2016).

In *Crookston v. Johnson,* 841 F.3d 396, 398 (6th Cir. 2016), the Court stayed an injunction affecting election procedures, and the reasoning readily supports denial of Plaintiff's request for an injunction here:

> There are many reasons to grant the stay.  The first and most essential is that Crookston offers no reasonable explanation for waiting so long to file this action. When an election is "imminen[t] and when there is "inadequate time to resolve [] factual legal disputes" and legal disputes, courts will generally decline to grant an injunction to alter a State's established election procedures.  See *Purcell v. Gonzalez*, 549 U.S. 1, 5-6, 127 S. Ct. 5, 166 L.Ed.2d 1 (2006) (per curiam).

That is especially true when a plaintiff has unreasonably delayed bringing his claim, as Crookston most assuredly has. See *Operating Engineers Local 324 Health Care Plan v. G & W Contr. Co.,* 783 F.3d 1045, 1053 (6th Cir. 2015); *Nader v. Blackwell,* 230 F.3d 833, 835 (6th Cir. 2000); *Kay v. Austin,* 621 F.2d 809, 813 (6th Cir. 1980).  Call it what you will—laches, the *Purcell* principle, or common sense—the idea is that courts will not disrupt imminent elections absent a powerful reason for doing so.

Here, Plaintiff unreasonably delayed in asserting his purported federal constitutional rights.  Because this is an elections matter time was of the essence.  The Defendant Board failed to act on Plaintiff's petition on May 26.  Plaintiff was informed at the Board meeting that prompt action in the courts would be necessary to place him on the ballot.  Plaintiff promptly filed suit in the Court of Appeals on May 27.  But he waited to file in this Court until June 6 (and did not serve Defendants until June 9 after this Court issued an order).  This was three days after the Secretary of State certified the slate of candidates to the counties, including the gubernatorial candidates, on June 3, 2022.  MCL 168.552(14).  Plaintiff offers no explanation for why he did not bring these claims to this Court earlier.  He could have filed contemporaneously in this Court and the Court of Appeals on May 27 or

any day after that before the June 3 deadline.[3]  To the extent Plaintiff

thought that he would be successful in the Michigan state courts and

did not pursue his federal claims because of that belief, it goes without

saying that a plaintiff should never presume success before a court.

Indeed, had he succeeded in the state courts, he could simply have

dismissed any federal action.  But the answer was not to wait until

losing before the Michigan Court of Appeals and the Michigan Supreme

Court, and after the Secretary's certification deadline had passed, to file

suit.  The delay was plainly unreasonable under the circumstances.

Further, the State Defendants and local clerks are clearly

prejudiced by the delay.  Plaintiff asks the Court to enjoin ballot

printing and fashion a remedy that would place him on the August 2022

---

[3] Johnson also fails to provide any legal basis why his claims could not
have been brought in the Court of Appeals.  Because Plaintiff has failed
to develop this argument, this Court should not take it upon itself to
formulate arguments on his behalf.  *See e.g. Hollon v Comm'r of Soc.
Sec*. 447 F.3d 477, 491 (2006).  But moreover, there is no reason why an
appropriate claim for declaratory relief could not be brought as an
"other appropriate process" under Mich. Comp. Laws 168.552(12),
which is the same statute under which Johnson filed his complaint in
the Michigan Court of Appeals.

primary ballot.  This could not be done without causing irreparable

harm to an orderly and efficient elections process and denying voters

their constitutional right to timely ballots.

MCL 168.552(8) requires that—not less than 60 days before the

primary election at which candidates are to be nominated—the

Secretary shall certify to the proper boards of election commissioners in

the various counties in the state, the name and post office address of

each partisan or nonpartisan candidate whose petitions have been filed

with the Secretary and met the requirements of this act, together with

the name of the political party, if any, and the office for which he or she

is a candidate.  This year, the primary election will occur on August 2,

2022, and so the 60-day deadline fell on June 3, 2022.  And Secretary

Benson performed her function by certifying candidates late in the day

on June 3.

Once the candidates are certified by the Secretary of State, it is

the responsibility of the county boards of election commissioners to

prepare and furnish the official primary ballots.  MCL 168.559.  The

county boards must print a number of primary ballots (in

approximately 5,000 different ballot styles) for not less than 25% more

25

than the total number of ballots cast in the primary held four years

previously (approximately 2.1 million ballots cast in August

2018).  MCL 168.563.  In practice, many counties print well in excess of

the minimum number to ensure they do not run out of ballots.  The

county boards must deliver absent voter ballots to the county clerk at

least 47 days before the primary election, and this year that date is

June 16.  MCL 168.713.  The county clerks must—at least 45 days

before the primary election—deliver the absent voter ballots to the

township and city clerks.  MCL 168.714.  The 45th day before the

primary is also the day on which absent voter ballots must be available

for delivery to military and overseas voters.  MCL 168.759a; Const

1963, art 2, § 4; 52 USC 20302.  This year, the 45th day before the

primary election is June 18, 2022.

In order to meet these tight timelines, counties begin the ballot

proofing and printing process right after the Secretary's certification.

Counties must send proof ballots of all the ballot styles used in their

jurisdictions to the Secretary for review.  Once approved by the Bureau

of Elections, the counties generally commence the printing process right

away.  As explained in the declaration from Ms. Lori Bourbonais of the

26

state Bureau of Elections, ballot printing has already commenced in many counties. (Ex D, Bourbonais dec.) The Bureau has already approved 79 counties for printing and, upon information and belief, numerous counties have already begun to print ballots (using printing vendors). *Id*., ¶ 10. The Bureau has confirmed that Kent, Macomb, Livingston, Oakland, Washtenaw, Jackson, and Ottawa Counties have all begun or have already completed ballot printing. *Id.* at ¶¶ 11-17.

If the Court were to order Plaintiff onto the ballot, these Counties and likely dozens of others before any order could be communicated to the 83 county clerks, would be required to re-print hundreds of thousands, if not millions, of ballots. Further, reprinting is not simply pushing a button. The ballots for every jurisdiction would have to be redesigned and then new proof ballots would have to be presented to the Bureau of Elections for approval. The counties would then have to send the new ballots to their printing vendors for printing. And new printed ballots would then have to be examined by the various jurisdictions for any errors. Clerks, the Bureau of Elections, and vendors need the full two weeks between the ballot certification deadline and the deadlines

for ballots to become available to complete the design, proofing, printing, and distribution process. Given everything that must be done, it is virtually impossible that re-printing could be accomplished with sufficient time to meet the June 16 and June 18 deadlines for having absent voter ballots available.  Moreover, as noted in Ms. Bourbonais's declaration, at least one printing vendor has advised that there would be insufficient paper to reprint ballots.  *Id.,* ¶ 19.

It is the Secretary's duty to ensure that the August primary is conducted in an orderly and efficient manner.  MCL 168.21, 168.31.  Further, it is the right of *all* Michigan voters to participate in an orderly and fair election.  This includes the right to timely receive absent voter ballots.  Mich. Const 1963, Art. 2, § 4(1)(b),(g).  But granting Plaintiff relief at this stage of the elections process will prejudice the Secretary, the local clerks ultimately responsible for printing and delivering absent voter ballots to voters, and the People of this State.  Even if there was any merit to Plaintiff's constitutional claims, the "rights" of one candidate—"rights" he slept on—should not prevail over the rights of the State and its millions of voters to

participate in an orderly and fair primary election.  This Court should

deny Plaintiff's request for injunctive relief based on laches.

### B.   Plaintiff has not demonstrated a substantial likelihood of success on the merits of his constitutional claims.

Even if this Court reaches the merits of Plaintiff's claims, he has

failed to meet his burden of showing a substantial likelihood of success.

In fact, Johnson's claims have no merit, and not only is Johnson not

entitled to any injunctive relief, but his claims ought to be dismissed.

Although the four factors must be balanced, and issues such as

timing can be an issue in election cases, nevertheless, the most

important factor is often the movant's likelihood of success on the

merits.  *Banerian v. Benson*, No. 1:22-CV-54, 2022 WL 985780, at *3

(W.D. Mich. Apr. 1, 2022) (citing *Obama for Am. v. Husted*, 697 F.3d

423, 436 (6th Cir. 2012) (internal quotation marks omitted)).  Indeed, a

finding that there is simply no likelihood of success on the merits is

usually fatal." *Gonzales v. National Bd. of Medical Examiners*, 225 F.3d

620, 625 (6th Cir. 2000).  That is true here, as Plaintiff is not likely to

succeed on any of her challenges to the constitutional amendment.

### 1. Plaintiff has not established a likelihood of success on his First Amendment claim.

Johnson alleges in his complaint that Defendants enforcement of Mich. Comp. Laws §§ 168.53 and 168.544(f), in combination with the "new" procedures used to determine that many of his signatures were fraudulent, imposed a "severe burden" upon Johnson and made it "impossible" for him to meet the signature requirement.  (ECF No. 1, PageID.14, ¶ 57).  The "new" procedures to which Johnson refers were used to determine that certain, specific and named circulators submitted an extraordinarily high number of invalid signatures.  (*Id.*, PageID.8, ¶30-32).  The Bureau of Elections compared 1,405 signatures collected by these fraudulent circulators and found that none of them were valid.  (*Id.*, PageID.9, ¶38).  Johnson contends that this constituted a "severe burden" on his rights and made it "impossible" for him to qualify to have his name placed on the ballot as a candidate in the August 2022 primary.  (*Id.*, PageID.15, ¶60).  While Johnson's Complaint fails to articulate precisely what First Amendment right he is alleging to have been burdened, it appears that he is challenging Michigan's ballot access requirements.

The "right to vote in any manner . . . [is not] absolute," *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (citation omitted); the Constitution recognizes the states' clear prerogative to prescribe time, place, and manner restrictions for holding elections.  U.S. Const. art. I, § 4, cl. 1.  Indeed, there "must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."  *Burdick*, 504 U.S. at 433 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).  Federal law thus generally defers to the states' authority to regulate the right to vote.  *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 203-04 (2008) (Stevens, J., op.) (recognizing that neutral, nondiscriminatory regulation will not be lightly struck down, despite partisan motivations in some lawmakers, so as to avoid frustrating the intent of the people's elected representatives).

When a constitutional challenge to an election regulation requires courts to resolve a dispute concerning these competing interests, courts apply the *Anderson-Burdick* analysis from *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, *supra*, which requires the following considerations:

> [T]he court must first consider the character and magnitude
> of the asserted injury to the rights protected by the
> [Constitution] that the plaintiff seeks to vindicate. Second, it
> must identify and evaluate the precise interests put forward
> by the State as justifications for the burden imposed by its
> rule. Finally, it must determine the legitimacy and strength
> of each of those interests and consider the extent to which
> those interests make it necessary to burden the plaintiff's
> rights.

*Green Party of Tenn. v. Hargett (Hargett II)*, 791 F.3d 684, 693 (6th Cir.

2015)(internal quotation marks and citations omitted).  "Though the

touchstone of *Anderson-Burdick* is its flexibility in weighing competing

interests, the 'rigorousness of [the court's] inquiry into the propriety of a

state election law depends upon the extent to which a challenged

regulation burdens First and Fourteenth Amendment rights.' "  *Ohio*

*Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016) (quoting

*Burdick*, 504 U.S. at 434).

If a state imposes "severe restrictions" on a plaintiff's

constitutional right to vote, its regulations survive only if "narrowly

drawn to advance a state interest of compelling importance."  *Burdick*,

504 U.S. at 434.  But "minimally burdensome and nondiscriminatory"

regulations are subject to a "less-searching examination closer to

rational basis" and "'the State's important regulatory interests are

generally sufficient to justify the restrictions.'" *Ohio Council 8 Am.*

*Fed'n of State v. Husted*, 814 F.3d 329, 335 (6th Cir. 2016) (citing *Green*

*Party of Tenn. v. Hargett (Hargett I)*, 767 F.3d 533, 546 (6th Cir. 2014),

and quoting *Burdick*, 504 U.S. at 434).  Regulations falling somewhere

in between—"i.e., regulations that impose a more-than-minimal but

less-than-severe burden—require a 'flexible' analysis, 'weighing the

burden on the plaintiffs against the state's asserted interest and chosen

means of pursuing it.' " *Ohio Democratic Party*, 834 F.3d at 627

(quoting *Hargett I*, 767 F.3d at 546).

### a.  The statutory scheme imposed a minimal burden on Johnson.

Michigan's statutory signature requirement does not impose more

than a minimal burden on candidates, justifying the "less searching"

analysis more akin to rational basis.  *Husted*, 814 F.3d at 335. Under §

544f Johnson was required to file at least 15,000 valid petition

signatures.  The Supreme Court has consistently recognized that states,

like Michigan, have an important interest in requiring some

preliminary showing of a significant modicum of support before printing

the name of a candidate on the ballot; this protects the integrity of the

electoral process by regulating the number of candidates on the ballot

and avoiding voter confusion.  *See Jenness v. Forton*, 403 U.S. 431, 441 (1971); *American Party of Texas v. White*, 415 U.S. 767, 783 (1974); *Munro v. Socialist Workers Party,* 479 U.S. 189, 194 (1986); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 367 (1997).  The Sixth Circuit has likewise recognized that states have "an important interest in ensuring that candidates demonstrate a 'significant modicum of support,' before gaining access to the ballot, primarily in order to avoid voter confusion, ballot overcrowding, and frivolous candidacies." *Libertarian Party of Kentucky v. Grimes*, 835 F.3d 570, 577 (6th Cir. 2016).  Section 544f advances that important interest in Michigan by requiring candidates demonstrate they have a significant modicum of public support for their candidacy.

From the pleadings, it does not appear that Johnson disputes the State's interest in having a signature requirement, or even the reasonableness of the 15,000-signature threshold.  Indeed, Johnson's brief acknowledges that the statutes are reasonable.  (ECF No. 2, PageID.37).  Instead, Johnson alleges that the threshold, acting in combination with the disqualification of fraudulent signatures, imposed

34

a severe burden upon him.  However, that argument fails to hold up to examination.

### b. Johnson does not have a First Amendment right to have fraudulent signatures accepted.

Johnson has not met the burden to explain how the signature requirement and the exclusion of fraudulent signatures, in combination, violate any of his rights.  Johnson's argument erroneously relies upon the state's interest in requiring candidates to demonstrate a "modicum of support," and concludes that interest does not balance against the burden imposed him.  But Johnson fails entirely to grapple with the State's interest in combating *fraud*.  The Sixth Circuit has held that a state's interest in preventing fraud is not only legitimate, but *compelling*.  *Thompson v. Dewine*, 959 F.3d 804, 811 (2020).  There, the Court quoted approvingly multiple cases recognizing the gravity of the state's interest in opposing election fraud.  *Id.* (quoting *John Doe No. 1 v. Reed*, 561 U.S. 186, 186 (2010)("The State's interest in preserving the integrity of the electoral process is undoubtedly important."); *Citizens for Tax Reform v. Deters*, 518 F.3d 375, 387 (6th Cir. 2008) ("[E]liminating election fraud is certainly a compelling state

interest[.]"); *Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 294 (1993)( "[S]tate[s] ha[ve] a strong interest in ensuring that its elections are run fairly and honestly.")

In contrast, Johnson fails to show that rejecting fraudulent petition signatures imposes a "severe burden" on any recognized First Amendment right.  Johnson does not deny that the signatures submitted by the fraudulent circulators were invalid, and he makes no attempt to rehabilitate any signatures collected by these individuals. Instead, he argues that fraudulent circulators who submitted hundreds of patently false signatures (e.g. signatures of persons who are dead or have moved, or where there is no registered voter at the listed address) might also have collected some valid signatures, and rejecting all of their signatures imposed a burden upon him.  But Johnson cites to no authority requiring that the Defendants give the benefit of doubt to circulators who have been found to have engaged in a widespread and intentional effort to commit fraud.  Johnson also offers no authority requiring either that the Defendants tolerate some amount of fraud, or that he must be allowed to qualify for the ballot with less than the

statutory requirement where thousands of his signatures were rejected due to fraud.

Furthermore, the Defendants' approach was not as heavy-handed as Johnson argues. Director Brater stated in his affidavit that, if they found any valid signatures during their check of a suspected fraudulent circulator, they took that circulator out of the "fraudulent" group, and the circulators rejected were those for whom the targeted checks revealed not a single valid signature. (Ex. A, Brater Affidavit, ¶57-66). This approach was appropriately balanced under the circumstances to eliminate only those signatures submitted by circulators who did not submit any valid signatures.

While Johnson takes issue with the procedures used to determine that the signatures were fraudulent, those arguments are more appropriately addressed in his due process challenge. For purposes of his First Amendment claim, Johnson has failed to show that the signature threshold, combined with the Defendants' rejection of fraudulent signatures, imposed a "severe burden" on his constitutional rights, or that the disqualification of fraudulent signatures was not balanced to the state's compelling interest in preventing fraud.

Moreover, while Johnson argues that it was "nearly impossible" to provide a sufficient number of valid signatures, he fails to acknowledge that *five* other Republican gubernatorial candidates succeeded in filing a sufficient number of non-fraudulent signatures.[4]  It was, therefore, plainly not impossible for him to have done so, as well.

For these reasons, Johnson has not shown a substantial likelihood of success on his First Amendment claim.

### 1.   Plaintiff has not established a likelihood of success on his procedural due process claim.

Johnson claims he has a fundamental right to seek public office and that he as deprived of that right without due process of law. (Count II) (ECF No. 1, Compl., ¶ 65, PageID.15.)

A procedural due process analysis contains two questions: "the first asks whether there exists a liberty or property interest which has been interfered with by the State, the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (citations omitted).  "Procedural due process rules are meant to

---

[4] https://mielections.us/election/candlist/2022PRI_CANDLIST.html

protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." *Carey v. Piphus,* 435 U.S. 247, 259 (1978).

For the first question, a protected right may arise from the Constitution itself, or through "an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). "The range of deprivations implicating a cognizable state-created liberty interests is narrow." *Memphis A. Phillip Randolph Inst. v. Hargett*, 482 F. Supp. 3d 673, 686 (M.D. Tenn.), *aff'd on other grounds* 978 F.3d 378 (6th Cir. 2020); *see also id.* at 687 ("[I]t is no small thing for a court to say that something is a cognizable liberty interest, such that procedural due process is applicable.").

But Johnson has not demonstrated that he has a cognizable liberty interest that is protected by procedural due process.  In fact, the Supreme Court has held that "an unlawful denial by state action of a right to state political office is not a denial of a right of property or of liberty secured by the due process clause." *Snowden v. Hughes*, 321 U.S. 1, 7 (1944).  This binding precedent is fatal to Johnson's procedural due process claim. *See also Newsom v. Golden*, No. 3:22-CV-00318,

2022 WL 1500860, at *7 (M.D. Tenn. May 12, 2022) (collecting cases);

*cf. Bullock v. Carter*, 405 U.S. 134, 142–43 (1972) ("[T]he Court has not heretofore attached such fundamental status to candidacy as to invoke a rigorous standard of review.").

The Sixth Circuit has on one occasion claimed it "is not clear" "whether an individual has a constitutionally protected interest in becoming a candidate for public office," and that "candidacy *may* involve some level of a protected property or liberty interest." *Miller v. Lorain Cnty. Bd. of Elections*, 141 F.3d 252, 260, 260 n.8 (6th Cir. 1998). That dictum is not only in tension with *Snowden*, 321 U.S. at 7, it was not a holding of the Sixth Circuit. Even assuming there was a lack of clarity, this is a § 1983 action, requiring a violation of *clearly established* constitutional rights. Therefore, even if this Court were to determine that there is a liberty interest in candidacy contrary to Supreme Court precedent, Johnson's claim would fail because such a right was not clearly established. *See, e.g., Sain v. Mitchell*, No. 07-CV-1187, 2009 WL 1457722, at *6 (W.D. Tenn. May 22, 2009), aff'd, 376 F. App'x 582 (6th Cir. 2010).

40

Even assuming that such a right was clearly established, Plaintiff has not established that he received an unconstitutionally deficient amount of process.  "Process is not an end in itself."  *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983).

It is worth observing that Johnson likely could have avoided many of the errors on his petition had he exercised any of the recommended petition quality control practices.  The Bureau specifically instructs candidates to implement a quality control process before filing a petition and to review all petition sheets prior to filing.  (Ex A, Brater Aff, ¶ 85.)  Doing both helps ensures that the maximum possible percentage of submitted signatures are valid.  *Id*.  It is also recommended that a copy of the QVF be purchased in order to review voter information and registration status.  *Id*. ¶ 86.  It is likely that had Plaintiff or campaign staff implemented processes and reviewed the petition sheets, the indications of obvious fraud would have been noticed.  *Id*. ¶ 88-89.

Johnson nevertheless argues that he was entitled to a hearing to allow him to respond to the evidence, and that he should have been provided with copies of digitized signatures; been provided with an

itemized list of the 9,383 specific signatures the Bureau considered

invalid and a specific explanation of why they were invalid; provided

Johnson with those items and then time to meaningful respond to the

claims of invalidity; and provide him the evidence the Bureau use to

determine the invalidity of the 9,383 signatures.  (ECF No. 2, Plf's Brf,

PageID.43-44.)

But the Board's meeting on May 26 *was* a hearing at which

Johnson could have, and did, present some testimony and evidence to

refute the staff report. Further, the canvassing process has never been

open to the participation of a candidate or his counsel; no statute

requires that.  It is true that Johnson was not provided copies of the

specific petition sheets or signatures determined to be invalid.  But,

that has never been the Board's practice and no statute requires as

much.  Further, given the time constraints, it would have been

impossible for the Bureau to do so for every candidate facing sufficiency

issues or a challenge.

Further, Johnson has, or should have, a copy of all his petition

sheets.  With respect to the signatures determined to be invalid based

on their collection and filing by *specifically identified fraudulent petition*

*circulators*, Johnson needed only to look through his sheets for the names of those circulators to see what sheets and what signatures were invalidated based on fraud.  And—as early as the April 26 challenge filed against his petition—Johnson had clear notice that many of these circulators were fraudulent.  And the reason those petition sheets were invalidated was explained in his staff report, which included examples of invalid signatures.  (Ex A, Brater Aff, Appendix 3, Johnson Staff Report.)  And even with the additional substantial time Johnson took between the Board meeting and filing this lawsuit, Johnson was not able to produce any evidence showing legitimate signatures; he has produced only 3 sheets he claims show valid signatures could have been submitted, but not a single signature on those sheets matches a signature for a valid registered voter. (Ex A, Brater Aff).

All Johnson would have needed to do to refute the staff report's conclusion that all the sheets provided by those circulators were invalid was to identify *any* valid signatures collected by each of the rejected circulators—or, even just enough circulators to bring him over the 15,000 signature threshold.  Johnson's staff report also identified the reason and number of signatures that were invalidated based on errors

other than fraud, including jurisdictional issues.  *Id.*  The evidence of fraud supporting the invalidation of these petition sheets was the sheets themselves, which revealed the fraudulent practices.  As for QVF signatures, again, those cannot be disclosed to persons not authorized to access the QVF.  MCL 168.509gg(1)(f).

As for timing, arguably it is a tight schedule for both Bureau staff and candidates, but that is principally a function of the statutes controlling the filing deadline and the time by which the Board must act.  Johnson filed his petition on the last day possible:  April 19.  Staff reports to address insufficiency issues and challenges to petitions are required by statute to be released two days before the Board's hearing on the sufficiency of petitions.  MCL 168.552(10), (11). Here, the Bureau released the staff reports, including the Fraud Staff Report and Johnson's individual report, during the evening of the *third* day before the May 26 scheduled meeting.  And the latest the Board could have met was May 31 and the latest the Board could meet to declare the sufficiency of petitions was June 3.  MCL 168.552(9), (11).  But waiting for these later dates was not realistic as it would not have provided any time for court proceedings.

Here, Johnson was provided with notice, and an opportunity to be heard commensurate with the relevant statutes, and factual circumstances, and was, in fact heard.  Accordingly, Johnson's due process rights were not violated, and so he has not demonstrated a substantial likelihood of success on this claim.

### C.    Plaintiff has not shown irreparable harm.

Although courts have presumed irreparable harm "when a candidate is unconstitutionally deprived of access to the ballot," *Esshaki v. Whitmer*, 455 F. Supp. 3d 367, 379 (E.D. Mich.), the key phrase in that passage is "*unconstitutionally* deprived."  Because Plaintiff cannot show that his constitutional rights have been violated as explained above, he will not suffer irreparable injury.

### D.    Issuance of a temporary or preliminary injunction would harm the State Defendants, local clerks, and the citizens of this State, and would be contrary to the public interest.

Factors three and four in the preliminary-injunction analysis— harm to third parties and to the public—coincide in this case.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (the harm to the opposing party and

the public interest "merge when the Government is the opposing party").

The State interests here are paramount.  States have a strong interest in the enforcement of their laws.  *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").  The election law sought to be enjoined, Mich. Comp. Laws § 168.544f, was duly enacted by the Michigan Legislature. Moreover, the people have an interest in the fair and orderly holding of elections.  *See Nader v. Blackwell*, 230 F.3d 833, 835 (6th Cir. 2000) (noting that "[a] state's interest in proceeding with an election increases as time passes, decisions are made, and money is spent."). As explained above in the laches argument, an order to place Plaintiff on the ballot will cause significant harm to the State's election process.  Ballots will have to be reprinted in numerous jurisdictions, which essentially starts the ballot proofing process all over again.  There is virtually no likelihood that all jurisdictions who will be impacted by an order requiring them to reprint ballots will be able to do so in time to comply

with other statutory and constitutional deadlines requiring that absent

voter ballots be available for sending by June 18—a mere 8 days from

now.

Thus, the balance of harms and public interest factors weigh in

the Defendants' favor—not Plaintiff's—and support denial of his

request for injunctive relief.

## CONCLUSION AND RELIEF REQUESTED

For the reasons discussed above, the State Defendants

respectfully request that this Court deny Plaintiff's request for a

temporary restraining order and/or a preliminary injunction.

Respectfully submitted,

*s/Heather S. Meingast*
Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Attorneys for Defendant
P.O. Box 30736
Lansing, Michigan 48909
517.335.7659
Email:  meingasth@michigan.gov
Dated: June 10, 2022          (P55439)

47

## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2022 I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing of the foregoing document as well as via US Mail to all non-ECF participants.

*s/Heather S. Meingast*
Heather S. Meingast (P55439)
Attorney for Defendant
P.O. Box 30736
Lansing, Michigan 48909
517.335.7659
Email:  meingasth@michigan.gov
(P55439)
