UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PERRY JOHNSON,

      Plaintiff,                               Case No. 22-11232

vs.                                         HON. MARK A. GOLDSMITH

MICHIGAN BOARD OF STATE
CANVASSERS, et al.,

      Defendants.
_____/

**OPINION & ORDER**
**(1) DENYING PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION (Dkt. 2), (2) GRANTING PLAINTIFF'S EMERGENCY MOTION TO EXPEDITE HEARING (Dkt. 13), (3) DENYING AS MOOT INTERVENOR'S MOTIONS TO INTERVENE (Dkts. 14, 15), AND (4) GRANTING DEFENDANTS' MOTION FOR LEAVE TO FILE EXCESS PAGES IN RESPONSE (Dkt. 20)**

Plaintiff Perry Johnson seeks the Republican Party's nomination for the office of Governor of Michigan, which he had hoped to secure in the primary election scheduled for August 2, 2022. However, the state Bureau of Elections (BOE) determined that Johnson had submitted thousands of fraudulent nominating petition signatures, leaving him short of the requisite 15,000 signatures necessary to appear on the ballot. Unsuccessful in his state court challenge to the BOE action that barred him from the ballot, Johnson has filed the instant action challenging his exclusion from the ballot, asserting First Amendment and due process claims. He now moves for a temporary restraining order and/or preliminary injunction to halt the printing of primary ballots or to add his name to the ballot (Dkt. 2). For the reasons that follow, the Court denies Johnson's motion.[1]

---

[1] A hearing was originally scheduled for June 14, but was advanced to June 10 following Johnson's emergency motion to expedite (Dkt. 13), which the Court has granted. At the time of the hearing,

# I. BACKGROUND

To have his name included on official Michigan primary ballots, Johnson was required to submit nominating petitions containing the valid signatures of at least 15,000 qualified and registered electors residing in the state. Mich. Comp. L. § 168.53; Mich. Comp. L. § 168.544f. Johnson's campaign collected and filed with the Michigan Secretary of State's office 23,193 signatures by the April 19, 2022 deadline. Pl. Br. in Supp. Mot. at 2. His campaign was assisted by third-party vendors, whose individual "circulators" collected signatures. Id. at 4.

Defendant Board of Canvassers—a bipartisan board created by Article II, section 7 of the Michigan Constitution—enforces rules relating to the qualification of nomination petitions. Deleeuw v. State Bd. of Canvassers, 688 N.W.2d 847, 849 (Mich. Ct. App. 2004). Its "sole duty regarding qualifying petitions is to determine whether the signatures on the petitions are valid . . . ." Id. The BOE "assists the Board in canvassing petitions" under the supervision of Defendant Jonathan Brater, Director of the BOE. Johnson v. Bd. of State Canvassers, No. 361564, 2022 WL 1787359, at *1 n.1 (Mich. Ct. App. June 1, 2022).[2] The BOE operates under strict statutory deadlines, including a requirement that Defendant Secretary of State Jocelyn Benson certify the candidates on the ballot by June 3, 2022 in the present election cycle.[3]

---

Defendants had not yet filed a written response to Johnson's motion requesting a temporary restraining order and/or preliminary injunction, but they did so later that day (Dkt. 19), with the Court granting Defendants' motion to file excess pages (Dkt. 20). Johnson's reply brief (Dkt. 21) completes the briefing on this motion. Because that motion is denied, the Court denies Carol Bray's motions to intervene as moot. (Dkts. 14, 15).

[2] The Secretary of State promulgates rules regarding ballot petition signatures, which encompass "[d]etermining the genuineness of the signature of a circulator or individual signing a petition." Mich. Comp. L. § 168.31(2)(b). The Director of the BOE—also identified as the Director of Elections—supervises the BOE and "perform[s] the duties of the secretary of state . . . with respect to the supervision and administration of the election laws." Mich. Comp. L. § 168.32(1). The Director is also a nonmember secretary of the Board of Canvassers. Id.

[3] Nine weeks before the primary—that is, by May 31, 2022—the Board was required to complete its canvassing of nominating petitions. Mich. Comp. L. § 168.552(9). Not later than 60 days

As the BOE explained in its May 23, 2022 staff report, the BOE has historically established procedures for assessing the sufficiency of nominating petitions. See 5/23/22 BOE Fraudulent Petitions Report (Dkt. 2-4). BOE staff first performs "face reviews" of the petitions for facial compliance with election laws, which includes checking for the circulator's signature and correct dates. Id. at 3–4. Then, if the candidate has enough potentially valid signatures remaining to meet the threshold after face review, the BOE reviews any third-party challenges to the petitions' sufficiency—due by April 26, 2022 for the forthcoming primary—by comparing each challenged signature to the signature on file in the Qualified Voter File (QVF). Id. at 4.[4]

However, the BOE was forced to update its procedures for the current election cycle due to an unprecedented incidence of fraud. See id. at 1. Upon reviewing the nominating petitions of multiple candidates, BOE "staff noticed [that] a large number of petition sheets, submitted by certain circulators, appeared fraudulent and consisted entirely of invalid signatures," id. at 2, as Brater further describes in a detailed affidavit, see Brater Aff. (Dkt. 19-2).[5] These petition sheets "tended to display at least one" of several criteria indicative of fraud. 5/23/22 BOE Fraudulent

---

before the primary—that is, by June 3, 2022—the Board was required to make "[a]n official declaration of the sufficiency or insufficiency of a nominating petition," Mich. Comp. L. § 168.552(11), and the Secretary of State was required to certify the candidates who had submitted sufficient petitions to the counties' boards of election commissioners, Mich. Comp. L. § 168.552(14).

[4] The QVF is "a statewide computer database of registered voters, that is available to election officials throughout the state" and maintained by the Secretary of State. People v. Hawkins, No. 357068, 2022 WL 188333, at *1 (Mich. Ct. App. Jan. 20, 2022).

[5] BOE staff first identified the issue in late March 2022 when canvassing the nominating petition filed by gubernatorial candidate Michael Markey, which contained many sheets of signatures showing indications of fraud. Brater Aff. ¶¶ 39–40. BOE staff were not aware that the fraud had spread beyond Markey's petition until mid-April, when staff began to review petitions for judicial candidate Tricia Dare—whose petition also contained facially fraudulent signatures submitted by a small number of circulators. Id. ¶¶ 46–47. The same issue arose in the later-submitted petitions of Johnson, Donna Brandenburg, Michael Brown, James Craig, and John Malone. Id. ¶ 50.

3

Petitions Report at 2.⁶  Initial comparisons between these submitted signatures and the QVF confirmed that the signatures were forgeries. Id. at 3. The BOE staff ultimately identified 36 individual "fraudulent-petition circulators" who were responsible for submitting multiple petition sheets consisting entirely of invalid signatures on behalf of eight candidates. Id. at 1.⁷

Confronted by a small number of identifiable circulators who had apparently submitted fraudulent nominating petitions, BOE staff enhanced their procedures. Prior to face review, the BOE separated the petitions of the suspect circulators and performed a targeted signature check across all signatures on those sheets—under the supervision of staff members experienced in signature review—to confirm line by line that "all sheets submitted by each fraudulent-petition circulator bore [] indications of fraud" and to "determine if any of the individual signatures appeared to be genuine despite the indications of fraud found on the sheet." Brater Aff. ¶¶ 52, 57; see also 5/23/22 BOE Fraudulent Petitions Report at 4–5. One common indicator staff noticed was that "the signatures, names, addresses, and dates on many of the fraudulent sheets were

---

⁶ These criteria were (i) an "unusually high number of petition sheets where every signature line was completed, or where every line was completed but one or two lines were crossed out"; (ii) sheets with "signs of apparent attempts at 'intentional' signature invalidity," such as counties listed in the "city or township" field or birth dates listed in the "date" field; (iii) an "unusually large number of petition sheets that showed no evidence of normal wear that accompanies circulation"; (iv) sheets that "appeared to be 'round-tabled,' a practice in which a group of individuals passes around sheets with each individual signing one line on each sheet with handwriting different from the circulator's handwriting,"; (v) sheets on which "blank and completed lines were randomly interspersed, indicating that a sheet had been submitted 'mid- round-table'"; (vi) sheets "where all ten lines had signatures and partial addresses or dates, but only a random subset [was] fully complete"; (vii) sheets "on which every instance of the handwriting of certain letters across different signatory lines and sheets, including in the signatures themselves, was near-identical;" and (viii) sheets "where the two or three distinct handwriting styles appeared on multiple sheets." 5/23/22 BOE Fraudulent Petitions Report at 2.

⁷ Thirty of these circulators submitted petitions on behalf of multiple candidates. See 5/23/22 BOE Fraudulent Petitions Report at 17. The BOE also received challenges to the sufficiency of nominating petitions that alleged that many of the same circulators already identified by the BOE had submitted fraudulent petition sheets. Id. at 3.

4

obviously signed by one or a small number of individuals." 5/23/22 BOE Fraudulent Petitions Report at 5. This review reaffirmed that the petition sheets submitted by fraudulent-petition circulators consisted entirely of forged signatures. Id.; Brater Aff. ¶¶ 52, 57.

Conscious that some genuine signatures may be buried in the forgeries, BOE staff took an additional step for the candidates for whom the exclusion of fraudulent-petition circulator sheets decreased their signature count below the required threshold. Brater Aff. ¶¶ 59; 5/23/22 BOE Fraudulent Petitions Report at 5. BOE staff began to cross-check as many individual signatures on suspect circulator sheets as possible against the signatures in the QVF. Brater Aff. ¶¶ 58–64; 5/23/22 BOE Fraudulent Petitions Report at 5. In making these comparisons, staff applied the standards utilized by the BOE to determine whether signatures match. Brater Aff. ¶ 64.[8] The BOE utilized this same procedure for all candidates submitting fraudulent-petition circulator sheets. Id. ¶ 52; 5/23/22 BOE Fraudulent Petitions Report at 4–5.

In total, the BOE compared at least 6,876 signatures to the QVF in their review of all eight candidates' petitions, and they did not identify a single valid registered voter with a matching signature across any of these submissions. Brater Aff. ¶¶ 66–67.[9] Brater estimates that the BOE spent more than 572 staff hours verifying fraudulent-petition circulator sheets against the QVF, mostly in the 11 business days between the May 6, 2022 deadline for candidates to respond to challenges and the May 23, 2022 release of BOE reports on the issue. Id. ¶ 79. For Johnson's

---

[8] See Michigan Department of State, April 2020 "Circulating and Canvassing Countywide Petition Forms": "Nominating and Qualifying Petitions," https://www.michigan.gov/sos/-/media/Project/Websites/sos/16delrio/SOS_ED105_County_Pet_Form.pdf (last visited June 11, 2022).

[9] The BOE staff identified a small number of potentially valid signatures on sheets submitted by circulators who had initially been identified as potential fraudulent-petition circulators. Brater Aff. ¶ 65. The BOE removed all such sheets from the category of fraudulent-petition circulators and included those signatures with the facially valid signatures, even though it appeared that many or most of the signature entries on those sheets were fraudulent. Id.

5

petition specifically, the staff crossed-checked the QVF for 1,405 of the 6,983 signatures (20.1%) submitted by a fraudulent-petition circulator. Id. ¶ 60. As with the signatures submitted by fraudulent-petition circulators for other candidates, every one of Johnson's signatures that was cross-checked against the QVF at this stage was fraudulent. Id.

If candidates had enough remaining signatures to potentially meet the threshold after the removal of fraudulent-petition circulator signatures, then the BOE proceeded to face review and—if necessary after face review—the processing of challenges. 5/23/22 BOE Fraudulent Petitions Report at 4–5. The subtraction of fraudulent-petition circulator sheets from Johnson's count did not bring him beneath the threshold, and so the BOE performed face review on the remaining signatures submitted on his behalf. Brater Aff. ¶ 53. Because Johnson's signature count fell below the threshold following face review, the BOE did not process the challenge filed against him. Id. ¶ 55.

On May 23, 2022, the BOE issued a report on its review of Johnson's nominating petition. See BOE Johnson Report (Dkt. 2-3). The report found that 9,393 total signatures were invalid, leaving Johnson with only 13,800 valid signatures. Id. at 1. The BOE determined that 6,983 signatures were invalid because they were "on sheets submitted by fraudulent-petition circulators." Id. The report identified various characteristics of fraud in the petition sheets submitted by 18 fraudulent-petition circulators on Johnson's behalf, and it excerpted examples of invalidated

signatures showing each characteristic. Id. at 2–4.[10]  The BOE also invalidated 2,410 signatures during face review, and its report categorized the types of errors it had identified. Id. at 1, 4–5.[11]

After these 9,393 signatures were invalidated, Johnson was 1,200 signatures short of the 15,000-signature threshold. Id. at 1. On this basis, the report recommended that the Board of Canvassers determine that Johnson's petition was insufficient to qualify him as a gubernatorial candidate for the August 2, 2022 primary. Id. at 6.

The Board of Canvassers held a meeting on May 26, 2022, at which Brater presented the BOE's findings and provided oral testimony. Def. Br. in Supp. Resp. 17. Johnson's counsel attended and argued unsuccessfully in favor of rehabilitating one signature deemed to be fraudulent. Id. The four-member Board voted on whether to uphold the BOE's recommendation and deadlocked two to two, which meant that Johnson's name would not appear on the ballot. See id.; Pl. Br. in Supp. Mot. at 8.

---

[10] These characteristics were: (i) "[s]ignatures from voters who have been canceled," including due to death or moving out of state, "or have not lived at the address on the petition for years"; (ii) "[m]isspelled names or addresses"; and (iii) "[r]epeated use of an uncommon signature abbreviation," including "the use of a first name and last initial as a signature." BOE Johnson Report at 2–5.

[11] Specifically, (i) 68 signatures were invalid because the signer was not registered to vote; (ii) 1,336 signatures were invalid because of "[j]urisdiction errors (no city in county known by name given by signer, dual jurisdiction entry, jurisdiction name given by signer does not align with address)"; (iii) 269 signatures were invalid because of "[d]ate errors (no date given by signer, date of birth entered, or date given by signer is later than circulator's date of signing)"; (iv) 81 signatures were invalid because of "[a]ddress errors (no street address or rural route given)"; (v) 239 signatures were invalid because of "[c]irculator errors (circulator did not sign or date petition)"; (vi) 15 signatures were invalid because of "[s]ignature errors (no signature or incomplete signature)"; (vii) and 402 signatures were invalid because of "[m]iscellaneous errors (signatures of dubious authenticity, where the petition signature does not match the signature on file or multiple signatures appear to have been written by the same individual)." BOE Johnson Report at 1, 4–5.  For some of these categories, the report excerpted examples of that type of invalid signature, provided further breakdowns of more specific types of errors within that category, or identified an example circulator who had submitted petitions affected by that category. Id. at 4–5.

On May 27, Johnson challenged the state's election procedures in state court, seeking a writ of mandamus from the Michigan Court of Appeals to compel the Board of Canvassers to certify his name as a candidate for the primary. See Johnson, 2022 WL 1787359, at *1. The Court of Appeals denied relief, finding that under Michigan law, the Board of State Canvassers "had the discretion to disqualify [the fraudulent-petition circulators'] obviously fraudulent signatures" without performing additional checks. Id. at *8–9. The Michigan Supreme Court denied leave to appeal on June 3. Johnson v. Bd. of State Canvassers, No. 164461, 2022 WL 1837990, at *1 (Mich. June 3, 2022).

Late in the day on June 3—the latest day allowed under Mich. Comp. L. § 168.552(14)—Secretary Benson certified the slate of candidates to the counties. Def. Br. in Supp. Resp. at 25. The counties are tasked with preparing the official primary ballots after receiving final BOE approval of proof ballots. See Mich. Comp. L. §§ 168.559–168.563. Faced with their own impending deadlines, counties immediately began the approval and printing process.[12] The BOE has now approved 79 counties for printing, and numerous counties have already commenced printing ballots, as attested by Lori Bourbonais, Director of the Election Administration Division within the BOE. Bourbonais Dec. ¶¶ 10–17 (Dkt. 19-5).

Johnson filed the instant action and motion on June 6, 2022.

## II. ANALYSIS

---

[12] By June 16, 2022—47 days before the primary—counties must deliver absent voter ballots to the county clerk. Mich. Comp. L. § 168.713. By June 18, 2022—45 days before the primary—the county clerks must deliver absent voter ballots to the township and city clerks. Mich. Comp. L. § 168.714.

The Court first addresses Defendants' argument that the doctrine of laches bars Johnson's suit, and it then addresses the merits of Johnson's motion for a temporary restraining order and/or preliminary injunction.

### A. Laches

Laches is a doctrine that applies to bar equitable actions where there is "a negligent and unintentional failure to protect one's rights." Chirco v. Crosswinds Communities, Inc., 474 F.3d 227, 231 (6th Cir. 2007) (punctuation modified, citation omitted). The doctrine is rooted in the principle that "equity aids the vigilant, not those who slumber on their rights." Lucking v. Schram, 117 F.2d 160, 162 (6th Cir. 1941). The party pleading laches has the burden of proof to show (i) lack of diligence and (ii) prejudice. McKeon Prod., Inc. v. Howard S. Leight & Assocs., Inc., 15 F.4th 736, 742 (6th Cir. 2021).

Defendants argue that the doctrine of laches precludes Johnson's suit. Def. Br. in Supp. Resp. at 20–26. The Court agrees. Johnson has had many opportunities to identify the issue of fraud infecting his nominating petition and to mount a defense to his disqualification well in advance of his June 6 commencement of this action. Johnson was on notice of the threat that fraud posed to his nomination by at least April 26, when Michigan resident and voter Bray filed a challenge to Johnson's petition that alleged deficiencies including the submission of wholly forged sheets by fraudulent-petition circulators. BOE Johnson Report at 6. There is also reason to suspect that Johnson should have identified the fraud on his own initiative, as the BOE specifically instructs candidates (i) to implement a quality control process before filing a petition and (ii) to review all petition sheets prior to filing. Brater Aff. ¶ 85. This request is especially reasonable for a candidate like Johnson who delegates the task of collecting nomination petitions to for-profit circulators of his choice. Defendants contend that Johnson likely could have avoided many of the errors on his petition had he exercised any of the recommended petition quality control practices.

9

Def. Br. in Supp. Resp. at 41.  Brater considers it "virtually impossible" that a candidate would fail to meet the threshold if he or she submitted the maximum allowable number of signatures and conducted the recommended quality check before submission.  Brater Aff. ¶ 88.

Despite these red flags, Johnson did not assert his current claims after the April 26 challenge, or the May 23 report recommending that his petition be found insufficient, or the May 26 Board of Canvassers meeting at which it became evident that his name would not be included on the ballot.  Instead, on May 27, Johnson challenged the state processes that denied his nomination for state office in state court.  Only after that effort failed did Johnson assert constitutional claims in federal court.

Given the tight deadlines under which elections officials operate, every day was crucial.  By the time this action was filed, the June 3 deadline for the Secretary of State to certify the slate of candidates to the counties had passed, evidencing the prejudice that Defendants would suffer if the Court granted Johnson his requested relief.  Dozens of counties—staring down a June 16 deadline by which they must deliver absent voter ballots to the county clerk, Mich. Comp. L. 168.713—have had their ballots approved, and several have commenced printing.  Bourbonais Dec. ¶¶ 10–17.  Defendants represent that an order to include Johnson on the ballot would require the counties to reprint hundreds of thousands of ballots, severely jeopardizing the counties' ability to finalize absent voter ballots on time.  Def. Br. in Supp. Resp. at 24–28.  At least one printing vendor has advised that there is not sufficient paper to reprint ballots.  Bourbonais Dec. ¶ 19.

Defendants have thus established both Johnson's lack of diligence and the prejudice that would result from granting Johnson's motion.  McKeon, 15 F.4th at 742.  Only on the rarest of occasions will "lower federal courts . . . alter the election rules on the eve of an election," Republican Nat'l Comm. v. Democratic Nat'l Comm., 140 S. Ct. 1205, 1207 (2020), and Johnson has pushed the timeline to the brink by "slumber[ing] on [his] rights," Lucking 117 F.2d 160.

### B. Factors for Temporary or Preliminary Equitable Relief

Johnson's request for a temporary restraining order and/or preliminary injunction also fails to satisfy any of the factors that must be considered for threshold equitable relief. These factors are: (i) whether the movant has a strong likelihood of success on the merits, (ii) whether the movant would suffer irreparable injury absent a grant, (iii) whether a grant would cause substantial harm to others, and (iv) whether the public interest would be served by a grant. Stein v. Thomas, 672 F. App'x 565, 569 (6th Cir. 2016) (punctuation modified, citation omitted). "These factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together." Id. (punctuation modified, citation omitted).

Johnson has not established a likelihood of success on either his First Amendment claim or his due process claim. The United States Court of Appeals for the Sixth Circuit has explained:

> When evaluating whether state election procedures violate First and Fourteenth Amendment election rights, we use the framework set out by the Supreme Court in Anderson v. Celebrezze, 460 U.S. 780, 788–789 (1983), and Burdick v. Takushi, 504 U.S. 428, 434 (1992). Under the Anderson/Burdick framework, we weigh the burden to a plaintiff's First and Fourteenth Amendment rights against the interests put forward by the State as justifications for its election procedures. Burdick, 504 U.S. at 434. Our inquiry is rigorous when the burden on a plaintiff's rights is severe, and more relaxed when the burden is slight or minimal. Id.

Stein, 672 F. App'x at 570 (citations modified).

Johnson asserts that Michigan's petition-qualification laws as enforced through the BOE's procedures burden Johnson's First Amendment and Fourth Amendments right to appear on the ballot, see Pl. Br. in Supp. Mot. at 14–15, 16, as well as voters' First Amendment rights to consider him on the ballot, id. at 14–15. He argues that the BOE "changed the rules after the game" to adopt procedures that are "are inherently arbitrary and contradictory," id. at 12, and by which the BOE can "invalidat[e] tens of thousands of signatures in one swoop without any review whatsoever," id. at 15. Johnson further protests that he had insufficient opportunity to challenge the BOE's decision because the BOE (i) provided insufficient preparation time between the May

11

23 report and the May 26 meeting, and (ii) failed to identify the specific signatures that it found invalid. See id. at 18.

These accusations mischaracterize the deliberate and objective methodology employed by the state agency tasked with enforcing election laws. The BOE utilizes established procedures for determining whether candidates have submitted sufficient valid nominating petitions. The BOE enhanced these procedures in response to its observation of an unprecedented intrusion of fraud. It applied these new procedures neutrally to the petitions of all affected candidates and devoted a significant share of its limited resources to the endeavor. Contrary to Johnson's charge that the BOE was invalidating signatures "without any review whatsoever," the BOE reviewed all signatures submitted by fraudulent-petition circulators under the supervision of staff experienced in signature review, and then it engaged in the more intensive process of double-checking thousands of these signatures against the QVF. Brater Aff. ¶¶ 52, 58–64; 5/23/22 BOE Fraudulent Petitions Report at 4–5. The state judicial system determined that this process complied with state law. Johnson, 2022 WL 1787359, at *1. This Court sees nothing arbitrary or capricious about the BOE's able handling of a dire and time-sensitive threat to election integrity.

Nor can Johnson candidly argue that he was cheated by the BOE's processes. He fails to cast doubt on the BOE's central conclusion: thousands of the signatures submitted on Johnson's behalf were forgeries. The BOE's rigorous review revealed that not a single signature submitted by a circulator identified in the fraudulent-petition category was genuine. Johnson suggests that a sampling bias might have resulted in the BOE failing to identify some number of genuine signatures buried in the otherwise fraudulent petitions, and he attaches three example sheets of signatures submitted by fraudulent-petition circulators that he states are "without any indicia of fraud to speak of." Pl. Br. in Supp. Mot. at 13–14 (citing Example March 2022 Petitions (Dkt. 2-5)); see also Pl. Reply Br. in Supp. Mot. at 6–7. He does not claim to have cross-checked these

12

signatures against the QVF. Brater performed that QVF check for these samples, and he determined that "[n]ot a single signature on the three sheets submitted by Mr. Johnson matches a signature corresponding to a valid, registered voter." Brater Aff. ¶ 121. Given Johnson's and the BOE's inability to identify any genuine signatures in the fraudulent-petition circulators' submissions—as well as Brater's opinion that the review population would have revealed some evidence of genuine signatures if any were present, see Brater Aff. ¶ 66—the Court cannot see how Johnson was harmed by the BOE's approach.

Johnson's last stabs at the state's electoral procedures are no more successful. The Court finds no fault with the BOE's decision to invalidate 2,410 signatures during face review. The BOE provided specific counts, categorizations, and examples of these disqualified signatures, see BOE Johnson Report at 1–5, and Johnson has provided no reason to suspect that any of these disqualifications were made arbitrarily or inaccurately.

Johnson cannot argue that he had insufficient time to prepare a defense where—as discussed—he has had notice of the issue for some time. Secretary Benson and the officials and staff working with her had no choice but to act expeditiously to meet statutory deadlines designed to ensure an election in accordance with Michigan law. And though Johnson complains that the May 26 Board of Canvassers meeting came only three days after the BOE released its report on his petition, the BOE purposefully scheduled the meeting for May 26 to allow the candidates to challenge their decisions in court before the June 1 certification, see Brater Aff. ¶ 69—an option Johnson exercised.

Johnson is also incorrect to suggest that the BOE identified only 78 of the signatures it determined were invalid. Pl. Br. in Supp. Mot. at 17.[13] The BOE's report also identified the 18

---

[13] Johnson appears to refer to (i) the 17 excerpted examples of signatures submitted by fraudulent-petition circulators that showed characteristics of fraud, BOE Johnson Report at 2–4; (ii) the two

fraudulent-petition circulators whose petition sheets had been deemed insufficient, BOE Johnson Report at 2, and so Johnson was well-aware of the precise identity of most signatures found to be invalid.

Against these supposed harms to Johnson's rights, the Court weighs the interests of the state. In applying its procedures to the petitions of various candidates under consideration for political office, the BOE was protecting state interests fundamental to a functioning democracy. "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some order, rather than chaos, is to accompany the democratic process." Storer v. Brown, 415 U.S. 724, 730 (1974). Michigan has "an important interest in ensuring that candidates demonstrate a 'significant modicum of support,' before gaining access to the ballot." Libertarian Party of Ky. v. Grimes, 835 F.3d 570, 577 (6th Cir. 2016) (quoting Jenness v. Fortson, 403 U.S. 431, 442 (1970)). Additionally, "preventing fraud by ensuring the authenticity of signatures . . . is a legitimate—indeed compelling—interest." Thompson v. DeWine, 976 F.3d 610, 618 (6th Cir. 2020); see also Citizens for Tax Reform v. Deters, 518 F.3d 375, 387 (6th Cir. 2008) ("[E]liminating election fraud is certainly a compelling state interest . . . .").

Balancing Johnson's harms and the state's interests, the Court finds that Johnson has failed to show a likelihood of success on the merits of his First Amendment and Fourteenth Amendment claims. Stein, 672 F. App'x at 570. The BOE staff employed eminently reasonable procedures to give Johnson's petition a fair and particularized review while operating on a tight timeline to advance important and compelling state interests. Johnson's failure to show that he is likely to prevail on the merits counsels strongly in favor of the denial of his motion for equitable relief.

---

example sheets each containing ten signatures invalidated due to jurisdictional errors, id. at 5; and (iii) the 40 signatures submitted by one specific circulator indicating miscellaneous errors, id.

Gonzales v. Nat'l Bd. of Med. Examiners, 225 F.3d 620, 625 (6th Cir. 2000) ("[A] finding that there is simply no likelihood of success on the merits is usually fatal").

The other factors courts consider when reviewing a motion for a temporary restraining order or preliminary injunction do not aid Johnson. A candidate might be able to argue irreparable injury if he or she were in fact unconstitutionally deprived of access to the ballot, but Johnson has shown no such constitutional deprivation. Further, as discussed, multiple parties would be prejudiced if the Court were to halt the printing of ballots or mandate that Johnson be added to the ballot, including the numerous counties currently diligently working to abide by the statutory duties to provide for a timely and orderly election. The public interest would also suffer from the court's disruption of these processes. Collectively, these factors weigh against granting Johnson's motion.

### III. CONCLUSION

For the foregoing reasons, the Court denies Johnson's motion for a temporary restraining order and/or preliminary injunction (Dkt. 2). The Court also grants Johnson's emergency motion to expedite a hearing (Dkt. 13), denies as moot Bray's motions to intervene (Dkts. 14, 15), and grants Defendants' motion for leave to file excess pages in their response (Dkt. 20).

SO ORDERED.

Dated: June 13, 2022                    s/Mark A. Goldsmith
    Detroit, Michigan             MARK A. GOLDSMITH
                                           United States District Judge